Frank L. **LAPORT**, Petitioner-Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent-Appellee.

No. 80–2723.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1981.
Decided Feb. 24, 1982.

George B. Collins, Collins & Amos, Chicago, Ill., for petitioner-appellant.

R. Russell Mather, Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before CUMMINGS, Chief Judge, SWYGERT, Senior Circuit Judge, and BAUER, Circuit Judge.

CUMMINGS, Chief Judge.

On his 1973 income tax return, Frank L. Laport claimed an ordinary loss deduction of $150,841, representing his out-of-pocket costs in a failed real estate transaction. The Commissioner of Internal Revenue agreed with the computation of the loss but not with its characterization. He found instead that it was a capital loss, deductible only to the extent of $1,000 against ordinary income. Accordingly he determined that Laport had underpaid his 1973 taxes by $73,093. The United States Tax Court upheld the Commissioner's determination, *Laport v. Commissioner*, 40 T.C.M. 1134 (1980) (CCH). Laport appealed to this Court, and we now affirm.

The facts of the transaction, as found by the Tax Court, are not disputed. Frank Laport is an attorney and real estate broker who lives in South Holland, Illinois. In August 1973 he became interested in two parcels of land totalling 2,059 acres in central Florida. The property was seventy miles from Disneyworld and three miles

from Interstate 75. It contained several lakes, some marshland, and timber worth approximately $250,000. After inspecting the site, Mr. Laport in October of 1973 paid $50,000 to Recreational Systems, Inc., for the assignment of a purchase contract; Recreational Systems had in turn bought the contract from ELM Investments, the original buyer. The sellers were John J. and Bärbel Curran.

The contract provided for a $1,647,832 purchase price. The price was broken down into the following components:

| | | |
|---|---|---:|
| (a) | First and second mortgages, on which the Currans were personally liable, and which the deed required Laport to assume | $1,038,374 |
| (b) | Laport's payment, by cash or cashier's check, to the Currans [1] | 362,000 |
| (c) | A purchase money note and mortgage to the Currans | 197,458 |
| (d) | A deposit (made by ELM Investments to the Currans and credited to Laport) | 50,000 |
| | | $1,647,832 |

Laport's out-of-pocket expenses were $150,000 in earnest money (including the $50,000 paid to Recreational Systems for the assignment of the purchase contract) and $841 for title abstract costs. Apparently to pay off the note to the Currans (item (c) above),[2] Laport borrowed $195,064.59 from Surfside Development, Ltd., a Bahamian corporation. The loan from Surfside was made on December 7, 1973, and was due two weeks later, on December 22. It was secured by a mortgage deed to Surfside as mortgagee on the property itself. The mortgage to Surfside was nonrecourse: Surfside agreed to look only to the land for security, and Laport had no personal liability.

With these arrangements in place, the deal was closed on December 7, 1973. The Currans conveyed the property to Laport by warranty deed dated November 27, 1973, stating that the conveyance was subject to the first and second mortgages which La-

---

1. The full $362,000 was apparently never paid. See the computations in note 3 *infra*. The reason may be that the sellers could not obtain the release of a separate, nonrecourse mortgage on the timber and so made an adjustment in the price.

2. A mortgage to the Currans is not further mentioned in the record.

port agreed to assume and pay. However, Laport's efforts to find long-term financing or to obtain an extension of the due date of the Surfside loan were fruitless. Unable to pay Surfside on December 22 as agreed, Laport quitclaimed the property to Surfside on that date. He received no money for the quitclaim deed, nor had he made payments on the first or second mortgages during the brief period of his ownership.[3]

From February to September 1974 Laport acted as Surfside's broker in attempting to sell the property. His commission, had he been successful, would have been 10% of the sales price. On October 21, 1974, Laport and Surfside organized Royal Pines, Ltd., a limited partnership. Laport, the general partner, contributed $7,000; Surfside, as limited partner, contributed $1,000 and the property. The partnership agreement apportioned profits and losses in the shares 88% to Laport and 12% to Surfside. Laport was to receive somewhat less than his usual 10% commission if the property were sold. Payments on the first and second mortgages were made by Surfside in 1974 and by Royal Pines, Ltd. thereafter. As of the January 1980 trial date, the property remained unsold.

The provision around which this dispute centers is Section 165 of the Internal Revenue Code (26 U.S.C. § 165 (1976)) which provides in pertinent part:

(a) General rule.—There shall be allowed as a deduction any loss sustained

**3.** Laport's loss is computed as follows:

| Laport's basis in the property | $1,038,734 | (2 original mortgages) |
| | 195,064.59 | (Surfside loan) |
| | 150,841 | (Laport's own funds) |
| | $1,384,639.59 | |
| Amount realized on the transaction under 26 U.S.C. § 1001(b) | $1,038,734 | (release of original mortgages) |
| | 195,064.59 | (release of Surfside mortgage) |
| | $1,233,798.59 | |
| Loss | $150,841 | |

This figure may understate Laport's loss slightly, since the amount of the note to the Currans was $197,458 and the amount borrowed from Surfside and transmitted to the Currans was $2,393.41 less than that. We will abide by the $150,841 stipulated amount of loss.

during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \*

(c) Limitation on losses of individuals. —In the case of an individual, the deduction under subsection (a) shall be limited to

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

(3) [uninsured casualty losses].

\* \* \* \* \* \*

(f) Capital losses.—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.[4]

The Tax Court ruled that the $150,841 deduction was not an abandonment loss under Section 165(a) of the Internal Revenue Code but rather was loss on the sale of a capital asset under Section 165(f).

*The Transfer Was Not an Abandonment Loss Under Section 165(a) of the Internal Revenue Code.*

Laport first argues that the expenses incurred in the land deal should be treated as an ordinary loss under Section 165(a) because he abandoned the property. In particular, he relies on Treasury Regulation 1.165-2 (26 C.F.R. § 1.165-2 (1981)):

*Obsolescence of nondepreciable property.*

The Tax Court wondered in passing why the loss was not almost $412,000, a figure arrived at by treating the purchase price ($1,647,832) as the basis and subtracting as amounts realized $1,038,734 (the first and second mortgages) and $197,458 (the loan from Surfside, slightly overstated). The answer appears to be that while the contract called for a $50,000 deposit and a $362,000 cash payment, Laport paid only the $50,000 deposit (indirectly) and $100,000 in cash. If the purchase price is reduced by $262,000, the Tax Court's computation and the stipulated figure converge.

**4.** Section 1211 of the Internal Revenue Code provides that individual taxpayers can deduct capital losses "only to the extent of [capital] gains \* \* \*, plus the taxable income of the taxpayer or $1,000, whichever is smaller." Section 1212 describes how capital losses may be carried over from year to year.

(a) *Allowance of deduction.* A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs.

(b) *Exceptions.* This section does not apply to losses sustained upon the sale or exchange of property, losses sustained upon the obsolescence or worthlessness of depreciable property, casualty losses, or losses reflected in inventories required to be taken under section 471. The limitations contained in sections 1211 and 1212 upon losses from the sale or exchange of capital assets do not apply to losses allowable under this section.

Laport did not discuss this regulation before the Tax Court, and ordinarily we would not consider matters raised for the first time on appeal. However, the regulation more clarifies than changes the pre-existing law of abandonment losses, and the pre-existing law was raised below.[5]

The regulation presents two conditions before it applies: that there be "a sudden termination of the usefulness * * * of the nondepreciable property," and that the "business or transaction [be] discontinued or * * * such property [be] permanently discarded from use therein." Laport's theory is that the October 1973 Middle East War and the ensuing Arab oil embargo so interfered with American tourism as to satisfy the first condition. He thinks that the surrender of the property to Surfside satisfies the second, and that the Tax Court erred in looking at his dealings with the property after the December 22 quitclaim deed.

In fact neither condition is met. However uninviting the Arab oil embargo might have made some uses of the property, it clearly did not cause a "sudden termination of [its] usefulness."[6] Nor were Laport's actions at the time consistent with the explanation he now offers. His efforts to acquire the property never slackened through October, November, and much of December. In a November 12 letter to Surfside he closed enthusiastically, "Assuring you that this is one deal that we are both going to make a lot of money on, I am, your future partner, Frank Leonard Laport, J.D." He obtained the loan from Surfside and closed on the property on December 7, although he could still have backed out then for less than he ultimately lost.[7] After the closing Laport continued to try to find long-term financing. The failure of those efforts and the inability to pay the Surfside loan when it came due, and not the machinations of OPEC, led to the quitclaim deed. Laport himself admitted as much: his letter transmitting the deed said, "I have elected to turn everything over to you because of my inability to meet my commitment."

Laport was equally unsuccessful in showing that he had discontinued the business or transaction in which the property was to be used or that he had permanently discarded the property itself. The efforts to sell the property at a profit continued—with at most a two-month interruption—first through the exclusive brokerage agreement and later through the limited partnership. And Laport's direct interest in the property was simply converted—after a ten-month

---

**5.** The main effect of the regulation is to resolve the timing question associated with abandonment losses. The case law had reflected some confusion about whether a taxpayer could claim abandonment when he still held legal title to the property. See Govt. Br. 12, n. 7.

**6.** Indeed it is unclear what use was contemplated. One of the attractions of the deal referred to in a letter from Surfside to Laport was that the mortgages already existing on the property could be released in stages. That suggests residential or commercial development, or sales of subdivided parcels, rather than development of the entire property as a resort or theme park.

**7.** The sales contract provided for liquidated damages of $50,000. In addition, the amount paid to Recreational Systems might not have been recoverable.

hiatus—from an ownership interest to a partnership interest. Such a maneuver is not equivalent to "permanent discarding."

In terms of the prior case law, Laport also failed to demonstrate an abandonment loss. Virtually the same elements had to be made out: worthlessness and an intent to abandon. This Court explained the worthlessness requirement in *Commissioner v. McCarthy*, 129 F.2d 84, 87 (7th Cir. 1942):

> The rule to be deduced from the "abandonment" cases, we think, is that a deduction should be permitted where there is not merely a shrinkage of value, but instead, a complete elimination of all value * * *.

Intent has to be inferred from all the surrounding facts and circumstances. *Hazeltine Corp. v. United States*, 170 F.Supp. 615, 620 (Ct.Cl.1959). Contrary to Laport's assertion that the inquiry could not consider events after the quitclaim deed, the Tax Court was entitled to look beyond the taxpayer's formal characterization. Its conclusion that there was no abandonment was fully supported by the evidence and by the credibility determinations Judge Nims necessarily made.

*The Transfer Was a Loss on the Sale of a Capital Asset Under Section 165(f) of the Internal Revenue Code.*

In the alternative, Laport argues that even if an abandonment is not directly made out, the transaction should be treated like an abandonment on the authority of *Crane v. Commissioner*, 331 U.S. 1, 14, n.37, 67 S.Ct. 1047, 1054, n.37, 91 L.Ed. 1301 [8] and not like a capital loss.

*Crane* dealt with a taxpayer who had inherited an apartment building subject to a nonrecourse mortgage. During the time she held the building, she treated gross rentals as income and deducted taxes, operating expenses, interest payments on the mortgage, and depreciation. Later she sold the building, still encumbered by the mortgage, for $2,500 net cash. The Supreme Court held that the amount realized on the sale included the face amount of the mortgage as well as the cash payment. However, the Court also remarked in footnote 37:

> Obviously, if the value of the property is less than the amount of the mortgage, a mortgagor who is not personally liable cannot realize a benefit equal to the mortgage. Consequently, a different problem might be encountered where a mortgagor abandoned the property or transferred it subject to the mortgage without receiving boot. That is not this case.

Laport argues that the footnote describes his case: he received no cash from Surfside; he had no personal indebtedness to Surfside and so realized no gain in the form of debt forgiveness; and he had enjoyed no tax benefit in the earlier stages of the transaction for which he should now be held accountable. In short, he asserts that the complete dearth of consideration means that his quitclaim of the property cannot be characterized as the "sale or exchange" of a capital asset and should instead qualify as an abandonment.[9]

There are two obstacles that preclude the result Laport wants, and both of them were recognized by the Tax Court. The first and simplest is that what Laport transferred to Surfside was not property encumbered by and worth no more than a nonrecourse mortgage. There were two prior recourse mortgages on the property, and Laport, by the express terms of the sale contract he took by assignment, agreed to assume both of them.[10] Therefore the transfer to Surf-

---

**8.** For a recent discussion, see Comment, "Crane's Footnote Thirty-Seven Gets the Boot," 11 Seton Hall L. Rev. 679 (1981).

**9.** The parties did not canvass the possibilities if neither a sale or exchange nor an abandonment was found.

**10.** Recreational Systems' assignment of the purchase contract required Laport "to abide by and perform each and every of the terms, provisions and requirements" of the purchase con-

tract. The purchase contract from the Currans bound the purchaser (Laport by assignment) to pay "$1,038,374 approximate principal balance on the first and second mortgages to be assumed." Laport also accepted the deed containing a clause that provided for the assumption of the mortgage debt: "[T]he Grantee [Laport] agrees to assume and pay [both mortgages] according to their terms and tenors." Under Florida law, Laport became personally liable on the mortgages. *Alabama-Florida Co. v.*

side relieved Laport of the duty to make payments on the first and second mortgages, and that consideration is obviously sufficient to transform the quitclaim into the sale of a capital asset, however restrictive the definition of sale might be.

The second obstacle is that the Tax Court had decided in *Freeland v. Commissioner,* 74 T.C. 970 (1980), that even the surrender of property worth less than a nonrecourse mortgage, without anything further, is the "sale or exchange" of a capital asset, giving rise to capital loss. Recognizing the problem, Laport states: "We concede that the *Freeland* case, if followed, would result in an adverse decision; we submit that it should not be followed" (Br. 12). On the contrary, we find the *Freeland* decision sound and well reasoned.[11] Far from representing an untoward departure from settled precedents, it finally reconciles two conflicting lines of cases and clears up the confusion that had lingered over *Crane's* footnote 37.

In *Freeland,* the taxpayer had bought nine acres of land near San Diego, California. Its $50,000 price was paid with a $9,000 down payment and a $41,000 nonrecourse mortgage. For eight years the taxpayer paid interest but made no reduction in principal. In 1975, when the fair market value of the property had declined to $28,000 and the costs of developing it in any way had soared to $220,000, Freeland quitclaimed the land back to the mortgagee. His deduction of $9,188 (his down payment and the cost of a title abstract) as ordinary loss was disallowed by the Commissioner andn whose decision was reviewed by the full Tax Court.

The result in *Freeland* is a logical extension of two earlier Supreme Court cases. *Helvering v. Hammel,* 311 U.S. 504, 61 S.Ct. 368, 85 L.Ed. 303, held that loss generated by a foreclosure sale of real estate was a capital loss. The Court reasoned that Congress meant to comprehend both voluntary and forced sales in the predecessor of Sections 1211 and 1212 of the Internal Revenue Code (n. 4 *supra*). It also noted that the legislative scheme, which makes restrictive capital loss deductions the *quid pro quo* of generous capital gains treatment, "would be defeated in a most substantial way if only a percentage of the gains were taxed but losses on sales of like property could be deducted in full from gross income." 311 U.S. at 510, 61 S.Ct. at 371.

In *Helvering v. Nebraska Bridge Supply & Lumber Co.,* 312 U.S. 666, 61 S.Ct. 827, 85 L.Ed. 1111 (*per curiam*), the rationale of *Hammel* was extended. The taxpayer in *Nebraska Bridge Supply* owned property on which the real estate taxes were delinquent. The delinquency created no personal liability. The tax lien was thus like a nonrecourse mortgage. Arkansas bid in the property at a tax sale, acquiring it without paying anything. The state was thus like the holder of a nonrecourse mortgage foreclosing on property worth less than the mortgage. The Eighth Circuit had allowed the taxpayer to take an ordinary loss deduction because "[t]he transfer of title to the State is not only involuntary, but is without any consideration moving to the transferor." 115 F.2d 288, 291 (1940). The Supreme Court summarily reversed.

Looked at from this perspective, the question presented in *Freeland* was whether a taxpayer can avoid the tax consequences of *Hammel* and *Nebraska Bridge Supply* by the simple expedient of quitclaiming the property before the mortgagee can foreclose. The *Freeland* Court saw no reason, nor do we, to put such a premium on artful timing.

Coming at the problem from the perspective of the *Crane* line of cases, the *Freeland* Court reasoned that they actually pointed to the same result. The argument based on *Crane's* Delphic footnote had been that a recourse borrower who conveyed encumbered property made a sale, because he received consideration in the form of relief from indebtedness. The nonrecourse borrower who conveyed encumbered property had no personal liability to be released

---

*Mays,* 111 Fla. 100, 149 So. 61 (1933); *Brownson v. Hannah,* 93 Fla. 223, 111 So. 731 (1927).

11. As we are apparently the first Court of Appeals to consider *Freeland,* we deal with it in detail.

from, received no consideration, and so made no sale. As already noted, this theory draws a curious line between quitclaim and foreclosure. But it also upsets the symmetry that the *Crane* case as a whole had established. For under *Crane* a taxpayer could acquire a basis in an asset with borrowed funds, whether the borrowing was recourse or nonrecourse.[12] And under *Crane* a taxpayer had to account for the borrowed funds when he sold the asset, whether the borrowing was recourse or nonrecourse. Only in the voluntary conveyance situation did the parity of treatment break down.

The *Freeland* Court restored parity by deciding that any relief from indebtedness, whether there was personal liability or not, would supply adequate consideration to transform a conveyance into a sale. It strengthened its conclusion with the observation that there were two distinct questions that could be asked in this general context: (1) was there a sale or exchange of a capital asset; and (2) what was the amount of loss or gain? *Crane* footnote 37 had addressed (2), since Mrs. Crane had undoubtedly sold her apartment building. *Freeland*—and Laport's appeal—focus on (1), since the amount of the loss is undisputed.

It would be less than candid to suggest that this result was as obvious in prospect as it is in retrospect. The confused and conflicting state of the law is described in detail in *Freeland* itself, 74 T.C. at 975–981. It is also less than candid to suggest, as Laport does, that he was affirmatively misled by the uniformity of pre-*Freeland* cases upholding ordinary loss deductions in circumstances like his. There was no uniformity. The taxpayer in *Freeland* had made a similar argument, urging the Tax Court to concentrate on precedents favorable to him and adhere to them under the doctrine of *stare decisis*. The Tax Court had a satisfactory answer:

> [T]here has been sufficient change in the judicial thinking on this subject, as evidenced by the cases decided since 1941, to cast considerable doubt on the validity of those decisions, and it would be wrong for us to ignore the more recent approaches to this issue simply to adhere to [*stare decisis*]. * * * [T]he validity of those cases has been sapped long before this, and the handwriting has been on the wall long before today. 74 T.C. at 982 (footnote and citation omitted)

For the foregoing reasons, the decision of the Tax Court is affirmed.

---

**12.** This is, of course, the principle that underlies tax shelters. The "at-risk rules" of 26 U.S.C. § 465 now limit the utility of nonrecourse borrowing in many kinds of tax shelters, but not speculative land deals of the type Laport undertook.