**James W. YARBRO and Mary E. Yarbro, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent.**

No. 83–4070.

United States Court of Appeals, Fifth Circuit.

July 30, 1984.

Rehearing and Rehearing En Banc Denied Aug. 30, 1984.

**480**

James W. Yarbro, Mary E. Yarbro, pro se.

Kenneth W. Gideon, Chief Counsel, I.R.S., Washington, D.C., Gilbert S. Rothenberg, Glen L. Archer, Jr., Tax Div., Gary R. Allen, Michael L. Paup, Chief, Appellate Section, John H. Menzel, Director, Tax Litigation Div., Dept. of Justice, Washington, D.C., for respondent.

Before BROWN, REAVLEY, and WILLIAMS, Circuit Judges.

**JOHN R. BROWN, Circuit Judge:**

This case presents the question of whether an individual taxpayer's loss resulting from the abandonment of unimproved real estate subject to a non-recourse mortgage exceeding the market value is an ordinary loss or a capital loss. Because the Commissioner may change an earlier interpretation of the law to another reasonable interpretation, we affirm the Tax Court's holding that an abandonment of real property subject to non-recourse debt is a "sale or exchange" for purposes of determining whether a loss is a capital loss.

*Facts*

James W. Yarbro (Taxpayer) [1] has been a self-employed financial and tax consultant since 1969. In 1972, he acquired a real estate broker's license. In that year, he formed three joint ventures and negotiated a separate land purchase for each of the ventures. Only the land purchase for the last of the three joint ventures is at issue here.

The venture was formed by Taxpayer, together with five other persons, for the purpose of acquiring about 132 acres of undeveloped land on the northern limits of the city of Fort Worth, Texas. The purchase price was $362,132.08. About 10% was paid in cash, and the balance was covered by four non-recourse promissory notes secured by deeds of trust on the property. Taxpayer took title to the property as trustee, and under the terms of the joint venture agreement, was responsible for managing the property. For his services as trustee and manager, Taxpayer received a one-time fee of $4,000. Taxpayer was also entitled to receive a 3% sales commission if the property were sold.

Each participant in the joint venture was required to contribute $4,100 in cash for each ten-percent interest purchased. One investor purchased a 50-percent interest, while the other investors, including taxpayer herein, each purchased a ten-percent interest. About six months after the joint venture was organized, taxpayer bought out one of the other ten-percent investors for $6,150, making his total investment in the joint venture a little over $10,000.

At the time the property was acquired, it was subject to a livestock grazing lease, and during the years the joint venture owned the property (1972 through 1976), it continued to be rented for grazing purposes at a rental of approximately $1,000 per year. The joint venture's only other income during those years was a small amount of interest. During that same period of time, the joint venture incurred expenses of about $23,000 each year for interest, taxes and insurance. Because these expenses greatly exceeded the income generated by the land, the participants were required to make annual pro-rata contributions to the venture. Taxpayer's contributions were about $4,500 per year.

Taxpayer acknowledged at trial that one of the primary purposes in purchasing the property was the expectation that the property would appreciate in value and that it could be sold at a later date for a substantial profit. Although the possibility of developing the property was considered, no definite development plans were drawn up, no improvements were ever made, and the joint venture participants were never asked to advance any funds for that purpose.[2]

In the summer of 1976, the City of Fort Worth decided to raise the real estate taxes on the joint venture's property by 435% from $770 per year to approximately $3,350 per year. At about the same time, real estate activity in the area completely dried up. As a consequence, by November of

---

1. Mary E. Yarbro, Taxpayer's wife, is a party to the suit solely by virtue of having filed a joint federal income tax return with her husband for the year 1976.

2. Other reasons taxpayer gave for purchasing the property were: (1) to further his property management business and to earn a $4,000 management fee, (2) to have the opportunity to earn a three-percent real estate commission if the property were ever sold, (3) to earn rental income, and (4) to become associated with Lawson Ridgeway, a local real estate developer who purchased a 50-percent interest in the joint venture.

1976, the property's fair market value had dropped below the face amount of the nonrecourse mortgage to which it was subject. When confronted with these facts, the joint venture participants decided to abandon the property and not to pay the real estate taxes for 1976 or the $22,811 annual interest payment for that year. Accordingly, on November 15, 1976, Taxpayer, as trustee, notified the Fort Worth National Bank (the trustee of the mortgages) that he was abandoning the property. Although the bank requested Taxpayer to reconvey the property to it, Taxpayer refused to do so, reasoning that he "had nothing to convey and would have nothing to do ... with the property from that point on."

In June, 1977, the bank obtained title to the property pursuant to foreclosure proceedings. None of the joint venture participants received any consideration from the foreclosure sale.

### The Tax

On his 1976 federal income tax return, Taxpayer claimed an ordinary loss of $10,376 from the abandonment of the joint venture property. The Commissioner, however, determined that Taxpayer's loss was not an ordinary loss, but, rather, constituted a long-term capital loss. The Commissioner took the position that Taxpayer's abandonment of the property constituted a "sale or exchange" within the meaning of Sections 1211 and 1222 of the Code. The Commissioner further contended that Taxpayer held his own interest in the land as an investment and not for use in taxpayer's "trade or business" or "primarily for sale to customers in the ordinary course of business." Thus, the Commissioner contended that the abandonment was a "sale or exchange" of a "capital asset."

The Tax Court agreed with the Commissioner's analysis. Determining that Taxpayer acquired his interest in the property

"primarily for investment purposes" the Tax Court held that the property was not used in Taxpayer's financial consulting and property management business within the meaning of Section 1231 of the Code. The Tax Court also concluded that the "casual" rental of the land for grazing purposes at a nominal fee did not evidence use of the land in a bona fide rental business, and that the evidence did not support a finding that the land was held primarily for sale to customers in the ordinary course of business. Finally, the Tax Court, following the course charted in *Freeland v. Commissioner*, 74 T.C. 970 (1980), and *Middleton v. Commissioner*, 77 T.C. 310 (1981), *aff'd per curiam*, 693 F.2d 124 (11th Cir.1982), held that an abandonment of property constituted a "sale or exchange" for purposes of Code Sections 1211 and 1222.

### Statutory Context

Section 165(a) of the Internal Revenue Code of 1954 provides, as a general rule, that taxpayers may deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). The application of this general rule, however, is limited by Section 165(f), which provides that "losses from *sales or exchanges* of *capital assets* shall be allowed only to the extent allowed in §§ 1211 and 1212." 26 U.S.C. § 165(f) (emphasis added). Taxpayer, by arguing that the abandonment was not a "sale or exchange," and that the land in the hands of the joint venture was not a "capital asset," seeks to establish that the loss was an ordinary loss. If accepted, this position would allow Taxpayer to avoid the limitations imposed by §§ 1211 and 1212 on the deduction that may be taken for capital losses.[3]

### "Sale or Exchange" by Abandonment

Taxpayer first argues that the Tax Court's decision that the abandonment of

---

**3.** There are two requirements for the capital gain and loss provisions to be applicable: (1) there must be a "capital asset" or property that is treated like a capital asset under § 1231, and (2) there must be a "sale or exchange." 29 U.S.C. §§ 165(a), (f), 1211, 1212. 8 Standard Federal Tax Reporter ¶ 4717 (CCH 1984). Thus, in order to affirm the holding that the loss was a capital loss, we must affirm that there was both (1) a "sale or exchange," and (2) a "capital asset."

property subject to a non-recourse mortgage is a "sale or exchange" must be rejected because it is a reversal of the position previously taken by the Commissioner, the Tax Court, and other courts. Taxpayer adds that he relied on their earlier positions. In support of this proposition, Taxpayer cites *Commissioner v. Hoffman*, 117 F.2d 987 (2d Cir.1941); *A.J. Industries v. United States*, 503 F.2d 660 (9th Cir.1974); *Blum v. Commissioner*, 133 F.2d 447, 448 (2d Cir.1943); *Bickerstaff v. Commissioner*, 128 F.2d 366 (5th Cir.1942); *Helvering v. Gordon*, 134 F.2d 685 (4th Cir.1943); *Denman v. Brumback*, 58 F.2d 128 (6th Cir.1932).

We point out that in these cases—except for *Blum*—the issue was not whether an abandonment is a "sale or exchange" for determining whether the loss is capital or ordinary. Instead, these cases decided in which year the loss is appropriately taken. The cases held that the loss was sustained in the year in which the property became worthless and was abandoned, rather than the year in which the taxpayer was technically divested of title. *Blum* held that the transaction in question was indeed a sale and not an abandonment, and concluded that there was a capital loss. In *Commissioner v. Green*, 126 F.2d 70 (3d Cir.1941) and *Helvering v. Jones*, 120 F.2d 828 (8th Cir.1941), the courts seem to assume that an abandonment was not a "sale or exchange," but nevertheless held that the loss was a capital loss because the taxpayers' interests in the property were not cut off until the later foreclosure sales, which themselves are "sales or exchanges." *Helvering v. Hammel*, 311 U.S. 504, 61 S.Ct. 368, 85 L.Ed. 303 (1941).

■ More recently, the Tax Court, in a case identical in material respects to this case, held that an abandonment of property subject to non-recourse debt is a "sale or exchange" resulting in capital loss treatment, and the Eleventh Circuit affirmed. *Middleton v. Commissioner*, 77 T.C. 310 (1981), *aff'd*, 693 F.2d 124 (11th Cir.1982). Assuming that *Middleton* was a departure from the prior position of the Commission-

er and the Tax Court, we reject Taxpayer's argument that such a departure is improperly applied retroactively. The Supreme Court has recently held that the Commissioner may change an earlier interpretation of the law, even if such change is made retroactive in effect, and even though a taxpayer may have relied to his detriment upon the Commissioner's prior position. *Dickman v. Commissioner*, — U.S. —, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984); *Dixon v. United States*, 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965). The Commissioner is not required to assert a particular position as soon as the statute authorizes such an interpretation. *Id.*

■ The interpretation of an agency charged with the administration of a statute is entitled to a substantial degree of deference. *Aluminum Co. of America v. Central Lincoln Peoples' Utility District*, — U.S. —, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984). To uphold an agency's interpretation, "we need not find that its construction is the only reasonable one.... We need only conclude that it is a reasonable interpretation of the relevant provisions." *Id.*, quoting *Unemployment Compensation Comm'n v. Aragon*, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946). As our discussion below indicates, the Commissioner in *Middleton* and in this case has given the statutory term "sale or exchange" a reasonable and practical interpretation in light of decisions more recent than the *Hoffman, Bickerstaff, Denman* line of cases. Moreover, the Tax Court, with its own expertise, has accepted that interpretation.

■ The term "exchange," in its most common, ordinary meaning implies an act of giving one thing in return for another thing regarded as an equivalent. Webster's New International Dictionary (2d ed. 1954). Thus, three things are required: a giving, a receipt, and a causal connection between the two. In the case of abandonment of property subject to nonrecourse debt, the owner gives up legal title to the property. The mortgagee, who has a legal interest in the property, is the beneficiary

of this gift, because the mortgagee's interest is no longer subject to the abandoning owner's rights.

In *Middleton,* as in this case, the taxpayer argued that, because the debt was nonrecourse and he therefore had no personal liability for the debt, he received nothing in exchange for his relinquishment of title. In essence, the argument is that because the taxpayer personally had no obligation to repay the debt, the abandonment could not have relieved him of any obligation. This argument is inconsistent with several Supreme Court decisions.

The Supreme Court has held that regardless of the nonrecourse nature of the debt, the taxpayer does receive a benefit from the disposition of the property: he is relieved of his obligation to pay the debt and taxes and assessments against the property. In *Crane v. Commissioner,* 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), the Supreme Court established that, in computing the *amount* of gain on the disposition, the outstanding debt must be included in the "amount realized" by the taxpayer, whether the debt is recourse or non-recourse. However, in that case Mrs. Crane, besides having the vendee take over the loan payments, received $2500 in cash (boot) on the sale. This left open the question of whether the non-recourse debt would be treated the same as recourse debt in situations where the outstanding debt exceeds the fair market value of the property. In such case, the owner-debtor would not obtain any boot by abandoning the property or transferring it subject to the mortgage.[4]

In *Commissioner v. Tufts,* 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), the Supreme Court answered this unanswered question by holding that where the debt exceeded the market value, the entire nonrecourse debt—not just the fair market value—was the "amount realized" by the

taxpayer on the disposition of the property. The *Tufts* court explained:

> We read Crane to have approved the Commissioner's decision to treat a nonrecourse mortgage in this context as a true loan.

> \*     \*     \*     \*     \*     \*

> When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date.

> \*     \*     \*     \*     \*     \*

> Because of the obligation to repay, the taxpayer is entitled to include the amount of the loan in computing his basis in that property;

> \*     \*     \*     \*     \*     \*

> Because there is no difference between recourse and nonrecourse obligations in calculating bases, Crane teaches that the Commissioner may ignore the nonrecourse nature of the obligation in determining the amount realized upon disposition of the incumbered property.

> \*     \*     \*     \*     \*     \*

> When the obligation is cancelled, the mortgagor is relieved of his responsibility to repay the sum he originally received and thus realizes value to that extent. . . .

461 U.S. at ——, ——, ——, 103 S.Ct. at 1831, 1832, 1834, 75 L.Ed.2d at 870, 871, 873.

Although *Crane* and *Tufts* concerned the *amount* of the gain or loss and not the *character* of the gain or loss, their rationales support the Commissioner's position in the instant case to the extent that the concept of "amount realized" for computing gain or loss may be equated with the concept of consideration for "sale or exchange" purposes.

Indeed, the Supreme Court in two decisions has followed the same approach of

---

4. In the now famous footnote 37, the *Crane* Court observed:

> Obviously, if the value of the property is less than the amount of the mortgage, a mortgagor who is not personally liable cannot realize a benefit equal to the mortgage. Conse-

quently, a different problem might be encountered where a mortgagor abandoned the property or transferred it subject to the mortgage without receiving boot. That is not this case. *Id.* at 14, n. 37, 67 S.Ct. at 1054, n. 37, 91 L.Ed. at 1301.

*Crane* and *Tufts* in the "sale or exchange" context.

■ In *Helvering v. Hammel*, 311 U.S. 504, 61 S.Ct. 368, 85 L.Ed. 303 (1941), and *Helvering v. Nebraska Bridge Supply & Lumber Co.*, 312 U.S. 666, 61 S.Ct. 827, 85 L.Ed. 1111 (1941), the Court held that there had been a "sale or exchange" and a capital loss even though the taxpayer had received no boot or other consideration, other than relief from a debt. In *Hammel*, the Court looked to the legislative purpose and history of the capital gain and loss provisions and held that "sale or exchange" included foreclosure sales. The involuntary nature of the transaction and the lack of any surplus from the sale to be returned to the owner did not make the foreclosure any less a "sale or exchange." Soon after *Hammel*, the Supreme Court rendered a decision, the relevance of which to the recourse-nonrecourse "sale or exchange" issue was aptly explained by the Seventh Circuit:

> In *Helvering v. Nebraska Bridge Supply & Lumber Co.*, 312 U.S. 666, 61 S.Ct. 827, 85 L.Ed. 1111 (per curiam), the rationale of *Hammel* was extended. The taxpayer in *Nebraska Bridge Supply* owned property on which the real estate taxes were delinquent. The delinquency created no personal liability. The tax lien was thus like a nonrecourse mortgage. Arkansas bid in the property at a tax sale, acquiring it without paying anything. The state was thus like the holder of a nonrecourse mortgage foreclosing on property worth less than the mortgage. The Eighth Circuit had allowed the taxpayer to take an ordinary loss deduction because "[t]he transfer of title to the State is not only involuntary, but is without any consideration moving to the transferor." 115 F.2d 288, 291 (1940). The Supreme Court summarily reversed.
>
> *Laport v. Commissioner*, 671 F.2d 1028 (7th Cir.1982). Based on the Supreme

Court's reasoning in *Crane*, *Tufts* and *Nebraska Bridge Supply*, we approve the Tax Court's acceptance of the Commissioner's interpretation that one who abandons property subject to non-recourse debt receives a relief from the debt obligation when he gives up legal title. Moreover, it is clear that the relief from the debt is what causes the abandonment. It was advantageous, in the view of the Supreme Court, for the Taxpayer to relinquish title only because the debt of which he was relieved was greater than the market value. Thus, under the Supreme Court precedents, the abandonment in this case involved a giving in order to receive something in return as the equivalent,[5] and therefore fit within the ordinary meaning of "sale or exchange."

Moreover, an abandonment of property subject to non-recourse debts has the same *practical effect* as several other transactions which have each been held to be a "sale or exchange." The Supreme Court has held that an involuntary foreclosure sale of real estate was a "sale or exchange" and the loss a capital loss. *Helvering v. Hammel*, 311 U.S. 504, 61 S.Ct. 368, 85 L.Ed. 303 (1941). In *Nebraska Bridge Supply*, the Court held a tax forfeiture to be a "sale or exchange." In *Laport v. Commissioner*, 671 F.2d 1028 (7th Cir. 1982), the Court held that the taxpayer's conveyance to the mortgagee by quitclaim deed in lieu of foreclosure was a "sale or exchange." In *Freeland v. Commissioner*, 74 T.C. 970 (1980), the Tax Court held that where the value of land sunk below the amount of a nonrecourse debt and the owner conveyed the land to the mortgagee by quitclaim, there was a "sale or exchange" and an ordinary loss.

The abandonment followed by the mortgagee's foreclosure in this case is the functional equivalent of the foreclosure sale in *Hammel*, the tax forfeiture in *Nebraska Bridge Supply*, and the quitclaims in lieu of foreclosure in *Laport* and *Freeland*. In

---

**5.** The mortgage agreement effectively treated the property and the debt as being equivalent in value.

all these transactions, the taxpayer-owner is relieved of his obligation to repay the debt and is relieved of title of the property. Because the mortgagee is legally entitled to recover title to the property in any of these cases, the fact that out of prudence he concludes he must go through foreclosure proceedings to formalize his interest in the land is not a rational basis for altering the character of the gain or loss realized by the taxpayer on the transaction. The differences in these transactions is not a difference in substance, but only in form.

The taxpayer who has decided that he cannot or should not make further payment on the nonrecourse loan can manipulate the form of the change in ownership of the property simply by either quitclaiming or abandoning the land before the mortgagee forecloses. Thus, the question is "whether a taxpayer can avoid the tax consequences of *Hammel* and *Nebraska Bridge Supply* by the simple expedient of [abandoning] the property before the mortgagee can foreclose. The *Freeland* Court saw no reason, nor do we, to put such a premium on artful timing." *Laport v. Commissioner,* 671 F.2d at 1033. *Cf. Diedrich v. Commissioner,* 457 U.S. 191, 102 S.Ct. 2414, 72 L.Ed.2d 777 (1982) (ignoring form of transaction in favor of the substance of the transaction).

Allowing taxpayers to manipulate the character of their losses from capital to ordinary by hastening to abandon rather than allowing foreclosure would frustrate the congressional purpose to treat capital gains and losses on a parity. As explained by the Supreme Court in *Hammel,* the *quid pro quo* of allowing generous tax treatment on capital gains is the limitation imposed on deductions for capital losses. 311 U.S. at 509–10, 61 S.Ct. at 370–371; 671 F.2d at 1033; 74 T.C. at 976. Thus, where the taxpayer would be eligible for capital gains treatment upon the sale of property had it appreciated in value, he should not be allowed to avoid the limitations on deductions for capital losses by using an artfully timed abandonment rather than a sale, voluntary reconveyance, or foreclosure. Accordingly, we affirm the Tax Court's holding that the Commissioner's interpretation of "sale or exchange" as including an abandonment of property subject to nonrecourse debt is a reasonable one.

### No Help from the Regulations

■ Taxpayer argues that "use of the term 'abandonment' in Regulation 1.165–2, paragraph (a) and the exclusion in paragraph (b) of losses from the 'sale or exchange' of property" shows that the regulation recognizes that an abandonment is not a sale or exchange. Section 1.165–2 provides:

*Obsolescence of nondepreciable property.*

(a) *Allowance of deduction.* A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs.

(b) *Exceptions.* This section does not apply to losses sustained upon the sale or exchange of property, losses sustained upon the obsolescence or worthlessness of depreciable property, casualty losses, or losses reflected in inventories required to be taken from section 471. The limitations contained in sections 1211 and 1212 upon losses from the sale or exchange of capital assets do not apply to losses allowable under this section.

1984 Fed.Tax Regs., Vol. I, p. 707.

Initially, we point out that courts have held that the subject of the sentence referring to "act of abandonment" is the proper *timing* of the deduction for abandonment

losses, and not the *character* of the loss. *Laport*, 671 F.2d at 1031, n. 5; *A.J. Industries, Inc. v. United States*, 503 F.2d 660, 666–70, n. 6, 6b (9th Cir.1974). Moreover, this Regulation is not applicable here, because subsection (b) of the Regulation provides that the Regulation "does not apply to losses sustained upon the sale or exchange of property ..." This case falls within the "sale or exchange" exception of subsection (b), for the reasons stated above. Thus, our holding is not inconsistent with the implication that taxpayer draws from the use of "abandonment" in subsection (a) and the use of "sale or exchange" in the exception of subsection (b). While some abandonments that bring nothing in return, such as the scrapping of obsolete equipment, may not be sales or exchanges, *cf.*, *e.g.*, *Louisville and Nashville R.R. Co. v. Commissioner*, 641 F.2d 435 (6th Cir.1981); *J.B.N. Telephone Co. v. United States*, 638 F.2d 227 (10th Cir.1981), and thus subject to this Regulation, nevertheless, an abandonment that is deemed to bring in return relief from a nonrecourse debt is a sale or exchange. Thus, this case is excepted from Section 1.165–2 by subsection (b), and the allowance by subsection (a) of a deduction for certain other abandonments is not inconsistent with our ruling.

### Capital Asset

■ Taxpayer argues alternatively that even if the abandonment is a sale or exchange, his loss was still ordinary because the land was not a "capital asset" in his hands. 26 U.S.C. § 1221.[6] Specifically, he argues that the land was not held for investment, but instead was "used in his trade or business" of renting property.

This Court has recently held that our review on the question of a taxpayer's holding purpose is narrowly confined by the Rule 52(a) "clearly erroneous" rule, even though it is an ultimate question of fact in deciding "capital asset" status. *Byram v. United States*, 705 F.2d 1418 (5th Cir.1983).[7] "The choice of a standard will determine the outcome of many cases," and this is one such case. 705 F.2d at 1421.

The Tax Court held that Taxpayer was not in the trade or business of renting property, and his interest in the land was not bought or held for that purpose. The Court declared: "We think petitioner acquired his interest primarily for investment purposes.... We are not persuaded that the casual rental converts the tract into property used in a trade or business within the meaning of the statute." This finding was supported by Taxpayer's testimony acknowledging that one of the primary purposes in purchasing the property was to realize an appreciation in value of the land expected to occur as a result of the growth of nearby Fort Worth. The only rental of the land was for grazing, which brought in approximately $1000 annually. That income covered only a minute part of the partnership's yearly expenses of approximately $71,470 (taxes, insurance, and primarily interest) incurred in owning the land during the same period. Even ignoring these expenses, the $1000 yearly rental would represent a rate of return of far less than 1% on the $362,132 investment in the property. Moreover, there were no improvements made on the land, nor any definite plans to make improvements in the future.

The Tax Court also held that the Taxpayer's interest in the land was not property used in his trade or business of tax and financial consulting, stating that the connection between the business and the owning of the interest in the land was too tenuous and conjectural. Taxpayer argued that he participated in the venture "to

---

**6.** Section 1221 of the Code, in pertinent part provides that a capital asset is "property held by the taxpayer (whether or not connected with his trade or business)." Excluded from the definition of a capital asset, however, is "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" and "real property used in his trade or business."

**7.** For criticism of the *Byram* holding, *see* Friedlander, *"To Customers" The Forgotten Element in the Characterization of Gains on Sales of Real Property*, 39 Tax.L.Rev. 31 (1983).

show [to his partner-clients] good faith belief that it was a worthy investment." However, that position means only that he was showing his clients that it was a good investment by choosing it for himself *as a good investment.* Taxpayer's assertion, therefore, supports the Tax Court's finding that he held the property for investment, rather than for *use* in his trade or business.

The Tax Court's position is further supported by another admission by the Taxpayer. Shortly after the joint venture was formed, all of the participants elected to be excluded from the partnership provisions of the Internal Revenue Code pursuant to Section 761(a) of the Code, which provides that an unincorporated organization may elect to be excluded from the partnership provisions of the Code if it is availed of "for investment purposes only and not for the active conduct of a business." On February 15, 1973, Taxpayer herein, as trustee, filed the Section 761 election, reciting that the joint venture "qualifies for the election as an investing partnership." Thus, although there was some evidence that Taxpayer's ownership of the property was somewhat related to his consulting business and that some rental income was received, we are not left, after reviewing the record, with a definite and firm conviction that a mistake has been made. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Accordingly, the tax court's finding that the property was a capital asset in Taxpayer's hands was not clearly erroneous, and must stand.

AFFIRMED.