*Decision will be entered under Rule 155.*

FRANK S. LOCKWOOD AND LINDA P. LOCKWOOD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 48476-86.        Filed February 28, 1990.

---

[30]See also *Martin v. Commissioner,* T.C. Memo. 1985-424.

*L. Guy Palmer,* for the petitioners.

*Janine M. Poronsky* and *James C. Lanning,* for the respondent.

WILLIAMS, *Judge:* The Commissioner determined deficiencies in petitioners' Federal income tax for the taxable years 1979 and 1980 in the amounts of $100,081 and $82,402, respectively. Respondent also determined increased interest pursuant to section 6621(c)[1] for 1979 and 1980. After concessions, the only issues remaining are: (1) Whether petitioners are entitled to a deduction for retirement for their master recordings in 1979, and (2) if so, the amount of the deduction.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners resided in Barrington, Illinois, at the time their petition was filed. Petitioner Frank S. Lockwood (hereinafter petitioner) was a bond trader during 1979.

---

[1] All section references are to the Internal Revenue Code of 1954 for the years in issue, unless otherwise indicated.

Around August 9, 1977, petitioner, doing business as FSL Enterprises, entered into an acquisition agreement with HNH Records Inc. (HNH). Harvey N. Hunt owned and operated HNH. Petitioner agreed to purchase an unidentified number of master recordings selected by HNH for a total price of $300,000. The acquisition agreement provided that petitioner pay HNH $15,359 cash in 1977 on the date of the agreement, principal payments of $4,173 and $28,707 in 1978 and 1979, and execute nonrecourse promissory notes for the $251,761 remaining principal balance.

Petitioner purchased five master recordings for half of the amount agreed upon in the acquisition agreement. The aggregate sales price for the five master recordings was $175,000.

Pursuant to the terms of the acquisition agreement, petitioner executed five separate nontransferable nonrecourse promissory notes (the notes), on or about August 9, 1977, in the aggregate amount of $146,848. The balance of the sales price was payable in cash and letters of credit. The notes were payable solely from the exploitation proceeds of the master recordings. Petitioner intended to repay the notes only from any proceeds from record sales. The notes were secured by validly perfected first liens on the records. The parties stipulated that the debt represented by the notes was intended by petitioner and HNH to create an absolute, definite obligation, not a contingent obligation. The parties also stipulated that the debt represented by the notes was bona fide and nonrecourse to petitioner.

Petitioners used the accrual method of accounting to account for sales and expenses attributable to the master recordings, an acceptable method of accounting that is not at issue. The initial determination of basis made by the petitioner in 1977 included the face amount of the nonrecourse promissory notes. The parties stipulated that the initial basis determination is not at issue in this case.

Pursuant to the acquisition agreement, petitioner entered into a distribution agreement with HNH on August 9, 1977. In the distribution agreement, petitioner gave HNH the exclusive rights to distribute and otherwise exploit the master recordings. Petitioner, through HNH, engaged

Wakefield Manufacturing Co. of Phoenix, Arizona, to manufacture records and tapes from the master recordings.

Hunt experienced personal problems, and neither he nor HNH ever exploited petitioner's master recordings. Petitioner asked another record catalog company to include his five master recordings in their catalog, but petitioner needed at least 25 to 30 recordings for inclusion in their catalog. Petitioner then attempted to arrange to market his five master recordings with Hunt's other master recordings. Hunt's attorney had the master recordings but was unwilling to participate.

In the fall of 1979, petitioner decided that it was not economically viable to pursue distribution or marketing of his five master recordings. He retained the master recordings and kept them on a closet shelf in his home. Petitioner's closet had no control for temperature or humidity. Petitioner knew that unless the master recordings were stored in a controlled environment, they would be damaged and become useless.

Petitioner paid $14,000 on September 12, 1978, and $27,417 on May 14, 1979, toward the principal payments on the notes. The principal balance remaining due on the notes in 1979 was $105,431. Petitioner deducted his remaining basis in the master recording, $117,250, as depreciation in 1979 because he determined the master recordings were retired.

At some time prior to January 9, 1981, Wakefield Manufacturing Co. asserted claims against petitioner, inter alia, for the costs of the manufacturing. The master recordings are no longer physically usable.

OPINION

Petitioner purchased five master recordings pursuant to an agreement for $175,000 in cash, letters of credit, and the notes. The notes, in the total amount of $146,848, were payable solely from proceeds of exploiting the master recordings. The issues we must decide are whether petitioner is entitled to a deduction for retirement for the master recordings in 1979 and if so, the amount of the deduction.

Petitioner argues that his basis in the master recordings includes the notes and that he is entitled to a deduction for retirement in the amount of his adjusted basis in the master recordings. Respondent first argues, contrary to his stipulation, that the principal of the notes should be excluded from petitioner's basis because the notes were contingent liabilities. Respondent also argues that petitioner canceled the notes by abandoning the master recordings and that the cancellation reduced his original basis and the deduction for retirement. In the alternative, respondent contends that petitioner is not entitled to a retirement loss because the master recordings were viable assets, not retired, at the end of the taxable year.

Respondent stipulated that the notes represented bona fide debt. Respondent also stipulated that petitioner's claimed basis was not at issue in this case. Petitioner's initial basis in the master recordings, therefore, includes the nonrecourse obligations. *Commissioner v. Tufts*, 461 U.S. 300 (1983); *Crane v. Commissioner*, 331 U.S. 1 (1947); *Mayerson v. Commissioner*, 47 T.C. 340 (1966). Because of the parties' stipulations, we restrict our analysis to the tax effect of retirement on this depreciable property.

Section 165 provides that an individual may deduct losses incurred in a trade or business or any transaction entered into for profit.[2] The parties agree that the master recordings were used in a trade or business or in a transaction entered into for profit. Section 1.165-2(c), Income Tax Regs.,[3] however, directs us to section 1.167(a)-8, Income Tax Regs., for the allowance of losses pursuant to section 165 arising from the retirement of depreciable property from use in the trade or business or in the production of income. *Coors*

---

[2] Sec. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

*　　*　　*　　*　　*　　*　　*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

   (1) losses incurred in a trade or business;

   (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business;

[3] Sec. 1.165-2(c), Income Tax Regs., provides in part:

For the allowance under section 165(a) of losses arising from the permanent withdrawal of depreciable property from use in the trade or business or in the production of income, see sec. 1.167(a)-8. * * *

*Porcelain Co. v. Commissioner,* 52 T.C. 682, 692 (1969), affd. 429 F.2d 1 (10th Cir. 1970). Consequently, the rules of regulation section 1.167(a)-8, Income Tax Regs., provide the guidance for determining losses for the permanent withdrawal of depreciable property from use in a trade or business or for the production of income.

This case presents whether the master recordings were permanently retired from petitioner's business and, if so, whether the loss is calculated by reference to section 1.167(a)-8(a)(4), section 1.167(a)-8(a)(3), or section 1.167(a)-8(a)(2), Income Tax Regs. If the recordings were "retired by actual physical abandonment," then loss is recognized to the extent of adjusted basis. Sec. 1.167(a)8-(a)(4), Income Tax Regs. If, however, the recordings were "not disposed of by the taxpayer," then loss (adjusted basis less the greater of salvage value or fair market value) is recognized but gain is not recognized. Sec. 1.167(a)-8(a)(3), Income Tax Regs. If there is an exchange on the retirement, other Code provisions usually governing the recognition of gain or loss would apply. Sec. 1.167(a)-8(a)(2), Income Tax Regs.

Retirement means the "permanent withdrawal of depreciable property from use in the trade or business or in the production of income." Sec. 1.167(a)-8(a), Income Tax Regs. A taxpayer may retire property by: (1) Selling or exchanging the asset; (2) withdrawing an asset from productive use without disposing of the asset; or (3) actual physical abandonment. Sec. 1.167(a)-8(a), Income Tax Regs.[4] Physical

---

[4]Sec. 1.167(a)-8(a), Income Tax Regs., provides in part:

(a) *Gains and losses on retirements.* For the purposes of this section the term "retirement" means the permanent withdrawal of depreciable property from use in the trade or business or in the production of income. The withdrawal may be made in one of several ways. For example, the withdrawal may be made by selling or exchanging the asset, or by actual abandonment. In addition, the asset may be withdrawn from such productive use without disposition as, for example, by being placed in a supplies or scrap account. * * * Upon the retirement of assets, the rules in this section apply in determining whether gain or loss will be recognized, the amount of such gain or loss, and the basis for determining gain or loss:

(1) Where an asset is retired by sale at arm's length, recognition of gain or loss will be subject to the provisions of sections [1001(c)], 1231, and other applicable provisions of law.

(2) Where an asset is retired by exchange, the recognition of gain or loss will be subject to the provisions of sections [1001(c)], 1031, 1231, and other applicable provisions of law.

(3) Where an asset is permanently retired from use in the trade or business or in the production of income but is not disposed of by the taxpayer or physically abandoned (as, for example, when the asset is transferred to a supplies or scrap account), gain will not be recognized. In such a case loss will be recognized measured by the excess of the adjusted basis of the asset at the time of retirement over the estimated salvage value or over the fair market value at the time of such retirement if greater,

    *     *     *     *     *     *     *

abandonment requires that the taxpayer intend to discard the asset irrevocably so that it will not be retrieved for use, sale, exchange, or other disposition. Sec. 1.167(a)-8(a)(4), Income Tax Regs.

In 1979, petitioner's distributor had failed to exploit the master recordings, and petitioner's own attempts to arrange marketing failed. Petitioner decided it was not economically viable to pursue distribution or marketing of the master recordings. He then stored the master recordings in his closet. The master recordings had to be stored in a controlled environment to preserve their usability. Petitioner was aware of this, and yet he stored the master recordings in a closet in his home rather than in a temperature-controlled room. In effect, petitioner physically abandoned the master recordings when he stored the master recordings on a shelf in his closet.

Petitioner's disposal of the master recordings in 1979 is governed by section 1.167(a)-8(a)(4), Income Tax Regs., providing the rules for retirement by actual physical abandonment because petitioner in effect discarded the recordings. He stored them in a manner that assured their destruction for their intended purpose. Consequently, we do not find that he permanently retired the master recordings without disposing of or physically abandoning them, section 1.167(a)-8(a)(3), Income Tax Regs., because leaving the master recordings on a closet shelf was tantamount to throwing them in the trash. Petitioner could have taken steps to preserve the recordings and testified that these classical music recordings had enduring appeal. In fact, the master recordings became physically ruined.

Both parties focus on the amount of petitioner's adjusted basis in the master recordings and the allowance of loss measured by the adjusted basis of the property at the time of retirement as permitted by section 1.167(a)-8(a)(4), Income Tax Regs. This regulation permits petitioner to recognize a loss equal to his adjusted basis in the master recordings as

(4) Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition.

of the abandonment in 1979. The master recordings were encumbered by a purchase money nonrecourse debt that was included in basis, and that debt was extinguished upon petitioner's discarding of the recordings on his closet shelf. Being relieved of that debt is a benefit realized by petitioner on the abandonment. *Middleton v. Commissioner,* 77 T.C. 310, 321 (1981), affd. 693 F.2d 124 (11th Cir. 1982). Petitioner's benefit from extinguishing the nonrecourse debt on abandonment was the remaining principal of the obligation. This realized benefit offsets petitioner's loss to the extent of the principal remaining on the debt that was extinguished. The amount of the loss that can be recognized is limited by the amount of the loss that is realized. Sec. 1001. Consequently, the extinguishing of the debt must be taken into account in calculating the recognizable loss. To calculate what loss petitioner realized, the amount of the principal of the debt that was extinguished, viz, $105,431, is subtracted from his adjusted basis of $117,250. Petitioner realized a loss of $11,819 which can be recognized pursuant to sec. 1.167(a)-8(a)(4), Income Tax Regs.

We also note that abandonment of real property secured by nonrecourse indebtedness has been regarded a "sale or exchange" for purposes of determining when a loss is sustained. *Yarbro v. Commissioner,* 737 F.2d 479 (5th Cir. 1984), affg. a Memorandum Opinion of this Court, cert. denied 469 U.S. 1189 (1985); *Middleton v. Commissioner, supra.* We believe that an abandonment of depreciable property encumbered by a nonrecourse obligation can similarly be viewed as an "exchange" for purposes of the rules governing loss recognition on retirements pursuant to section 1.167(a)-8(a), Income Tax Regs.

In *Middleton v. Commissioner, supra,* taxpayers were limited partners in a partnership that purchased undeveloped land by paying cash, assuming existing nonrecourse mortgages, and making nonrecourse purchase-money mortgages. The fair market value of the properties decreased substantially below the amounts due on the mortgages and the partnerships abandoned the properties. The mortgagees refused the partnership's offer to deed the parcels back, and foreclosed in due course. We held that the partnership sustained losses at the time of the abandonment and that

the loss was realized as an exchange at the time of the abandonment and not at the subsequent foreclosure sale.

Similarly, in *Yarbro v. Commissioner, supra,* abandonment of real property subject to a nonrecourse debt was held to be an exchange. In *Yarbro,* the fair market value of land that a joint venture had purchased dropped below the face amount of the nonrecourse mortgage. The court held that the abandonment was an exchange, i.e., an act of giving one thing in return for another thing regarded as equivalent. 737 F.2d at 483. The court reasoned that when the taxpayer abandoned property subject to nonrecourse debt it (1) gave up legal title to the property and (2) received relief from the nonrecourse obligation (*Commissioner v. Tufts, supra; Crane v. Commissioner, supra*). 737 F.2d at 483-485.

The implication of these holdings for abandoned property subject to purchase money nonrecourse indebtedness is that such abandonment is an exchange. See *Daily v. Commissioner,* 81 T.C. 161 (1983), affd. without published opinion 742 F.2d 1461 (9th Cir. 1984). The fact that petitioner's property is depreciable rather than a capital asset does not diminish the force of these authorities. What characterizes the abandonment as an "exchange" is the extinguishing of the debt concomitantly with the taxpayer's giving up his rights to the property. Exchange treatment would not necessarily arise if the debt were recourse because the debt would not be extinguished by the act of abandonment. Our holding, therefore, does not eliminate the differences in treatment prescribed by section 1.167(a)-8(a)(4), Income Tax Regs., from the treatment prescribed by section 1.167(a)-8(a)(2), Income Tax Regs., which applies specifically to exchanges.

Section 1.167(a)-8(a)(2), Income Tax Regs., provides that "where an asset is retired by exchange, the recognition of gain or loss will be subject to the provisions of sections [1001(c)], 1031, 1231, and other applicable provisions of law." Petitioner's gain or loss on the abandonment characterized as an "exchange," therefore, is measured by the amount realized less the basis in the master recordings. Sec. 1001. The amount realized on the sale, exchange, or disposition of property encumbered by a nonrecourse debt includes the amount of the obligation. *Commissioner v.*

*Tufts, supra; Crane v. Commissioner, supra.* Petitioner, therefore, recognized a section 165 loss on the abandonment in the amount of $11,819.

Respondent also argues that petitioner destroyed his obligation pursuant to the notes when he abandoned the master recordings, and because the notes were to be paid only from sales, any possibility of payment was eliminated by abandonment. Respondent concludes that the notes were thereby canceled and the cancellation resulted in a reduction of original purchase price, citing *Hirsch v. Commissioner,* 115 F.2d 656 (7th Cir. 1940); *Gehring Publishing Co. v. Commissioner,* 1 T.C. 345 (1942); and *A.L. Killian Co. v. Commissioner,* 44 B.T.A. 169 (1941), affd. 128 F.2d 433 (8th Cir. 1942). Under this theory, petitioner would not be entitled to any loss because he would have a zero basis in the master recordings.

In the cases respondent cites, a buyer of property negotiated with the seller/creditor for a discharge of all or part of purchase money indebtedness to reflect a decline in the value of the property. The buyer and seller or creditor agreed to reduce the purchase price and the resulting discharge of indebtedness was characterized as a retroactive reduction of the purchase price rather than income. These cases represent an exception to the general rule that discharge of indebtedness is income. *OKC Corp. & Subsidiaries v. Commissioner,* 82 T.C. 638, 647 (1984).[5] In the present case, we have no agreed reduction in the purchase price for the master recordings. Instead, we have a unilateral act by petitioner, the physical abandonment. Respondent's cited cases, therefore, are inapposite.

*Decision will be entered under Rule 155.*

---

[5]We have also noted that these cases were all decided before *Crane v. Commissioner,* 331 U.S. 1 (1947). *Millar v. Commissioner,* 67 T.C. 656, 661 n. 3 (1977), affd. in part 577 F.2d 212 (3d Cir. 1978).