LESTER J. ARKIN AND SANDRA ARKIN, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2946–78.    Filed June 25, 1981.

---

*Alan Jeffrey Barash* and *S. Harvey Ziegler*, for the petitioners.

*W. Robert Abramitis*, for the respondent.

WILBUR, *Judge*: Respondent determined a deficiency in petitioners' Federal income tax for the calendar years 1974 and 1975 in the amounts of $5,734 and $4,799, respectively. Due to concessions by petitioner,[1] the sole issues remaining for our decision are:

(1) Whether petitioner abandoned his interest in a Florida land trust in the year 1974, and if so, whether the loss sustained is ordinary or capital; and

(2) Whether petitioner is entitled to a deduction for Keogh Plan contributions in excess of $7,500 for the calendar year 1975.

---

[1]Because Mrs. Arkin is a party to this proceeding solely by virtue of filing a joint return with her husband, Mr. Arkin will generally be referred to as petitioner.

## FINDINGS OF FACT

At the time the petition was filed in this case, petitioners Lester J. Arkin and Sandra Arkin resided at Miami Beach, Fla.

On his 1974 income tax return, petitioner claimed an ordinary loss deduction in the amount of $32,400 for "Acreage—Palm Beach County—Acreage Abandoned in 1974." The property referred to in the claimed loss is undeveloped real property which was acquired by a group of investors, petitioner among them, in December of 1973 through the medium of a Florida land trust. The property was first acquired on December 28, 1973, by Leo Rose, Jr., petitioner's law partner, for a group of investors that included petitioner. The purchase price was $3,200,000, with $2,560,000 being financed by a wraparound, nonrecourse, purchase-money note and mortgage signed by Leo Rose, Jr. On December 31, 1973, Leo Rose, Jr., executed a deed conveying the property to the Florida Bank at Fort Lauderdale (the bank) to hold as trustee of Land Trust No. LT–0239 (the land trust).

Also on December 31, 1973, a land trust agreement was executed between the bank and 10 named beneficiaries (investors) whereby the beneficiaries conveyed their interests in the property to the bank as trustee of the land trust. Petitioner was one of the beneficiaries and received a 5-percent interest in the land trust, which entitled him to 5 percent of any earnings or proceeds from the trust property. Petitioner paid $32,197 for his 5-percent interest in the land trust on January 8, 1974, to Adler-Donner Associates, a firm which advanced funds to the group of investors for their purchase of the land in December.

The purpose of the land trust was to hold title to the property until its sale. The land trust agreement provided that the beneficiaries were to have full and exclusive control over the management and operation of the trust property. The agreement also provided that the interests of the beneficiaries were rights of personality, and that the beneficiaries, individually, were to report and pay their share of income taxes on the earnings and proceeds of the property proportionate to their interests in the land trust. The agreement provided that the trustee had no duty respecting the payment of taxes, insurance premiums, or other costs or charges against the property. It was understood by petitioner and other investors that the purchase-money mortgage and property taxes were to be paid by

individual contributions from the beneficial owners of the land trust proportionate to their interests, although this requirement was not stated in the written agreement.

The general objectives of the trust were described in the agreement as follows:

> *Objects and Purpose of Trust*: The objects and purposes of this Trust shall be to hold title to the trust property and to protect and conserve it until its sale or other disposition or liquidation. The Trustee shall not manage or operate the trust property nor undertake any other activity not strictly necessary to the attainment of the foregoing objects and purposes; nor shall the Trustee transact business of any kind with respect to the trust property within the meaning of Chapter 609 of the Florida Statutes, or any other law; nor shall this Agreement be deemed to be, or create or evidence the existence of a corporation, de facto or de jure, or a Massachusetts Trust, or any other type of business trust, or an association in the nature of a corporation, or a co-partnership or joint venture by or between the Trustee and the Beneficiaries, or by or between the Beneficiaries.

The trust agreement also contained the following provision concerning reimbursement and indemnification of the trustee:

> *Reimbursement and Indemnification of Trustee*: If the Trustee shall pay or incur any liability to pay any money on account of this Trust, or incur any liability to pay any money on account of being made a party to any litigation as a result of holding title to the trust property or otherwise in connection with this Trust, whether because of breach of contract, injury to person or property, fines or penalties under any law, or otherwise, the Beneficiaries jointly and severally agree that on demand they will pay to the Trustee, with interest thereon at the rate of 6% per annum, all such payments made or liabilities incurred by the Trustee, together with its expenses, including reasonable attorneys' fees, and that they will indemnify and hold the Trustee harmless of and from any and all payments made or liabilities incurred by it for any reason whatsoever as a result of this Agreement; and all such amounts so paid by the Trustee, as well as its compensation hereunder, shall constitute a lien on the trust property. * * *

The agreement provides that the interests of the beneficiaries consist solely of the right to manage, control, and direct disposition of the trust realty and to receive a proportionate share of the income from or sales proceeds of the property. It is further provided that these "rights shall be deemed to be personal property and may be assigned and otherwise transferred as such." Regarding transfer, the agreement provides:

> *Method of Assigning Interest of Beneficiary*: The interest of a beneficiary, or any part thereof, may be transferred only by a written assignment, executed in duplicate and delivered to the Trustee. The Trustee shall note its acceptance on

the original and duplicate original of such assignment, retain the original and deliver the duplicate original to the assignee as and for his or her evidence of ownership of a beneficial interest under this Agreement. No assignment of any interest under this Agreement (other than by operation of law) that is not so executed, delivered and accepted shall be binding upon the Trustee. * * *

The land trust had no value apart from the individual real estate which comprised its corpus. As an experienced real estate attorney, petitioner was aware of and sensitive to the real estate market in Florida. Petitioner purchased his interest because he believed that the market for real estate was very favorable at the time. However, during the middle of 1974, a recession halted property development and the market for real estate declined dramatically. After receiving an opinion from an outside real estate investor as to the value of the land trust property, petitioner decided in late 1974 that his interest in the property was not then worth his initial investment or any future investment.

By letter dated December 23, 1974, petitioner notified the bank and each of the other beneficiaries of his intention to abandon his interest in the land trust. A payment on the property of $265,000 under a promissory note secured by the purchase-money mortgage was due December 31, 1974. Additionally, 1974 real estate taxes in the amount of $41,529.10 had been billed and were payable sometime between November 1974 and March 1975.[2]

In addition to the 1973 purchase-money mortgage, there were two prior mortgages on the property. On February 7, 1975, a complaint was filed by a prior mortgagee, American Community Systems, Inc., to foreclose its mortgage. On April 19, 1977, the Circuit Court for Palm Beach County, Fla., entered a final summary judgment of foreclosure and found that the lien on the property held by American Community Systems, Inc., was prior and superior to any claim or interest held by Leo Rose, Jr., as trustee, and Florida Bank at Fort Lauderdale, as trustee, and any persons claiming through them. In May 1977, American Community Systems, Inc., purchased the property at the foreclosure sale for $1,000.

During the years 1974 and 1975, petitioner was a partner in a

[2]The full amount was due in March 1975. Payment prior to that date was subject to a specified discount.

law partnership known as Meyer, Weiss, Rose & Arkin. The partnership reported its income on a fiscal year ended March 31. In December of 1975, the partnership was dissolved and filed a final tax return for the period April 1, 1975, to December 31, 1975. The partnership had as its only retirement plan in the calendar year 1975, a Keogh Plan which received contributions on behalf of petitioner. On his 1975 Federal income tax return, petitioner claimed a deduction in the amount of $15,000, which represented partnership contributions to the Keogh Plan on behalf of petitioner in the amount of $7,500 for the partnership's fiscal year ended March 31, 1975, and in the amount of $7,500 for the partnership's short final year ended December 31, 1975.

OPINION

*Issue 1. Capital or Ordinary Loss*

In December of 1973, petitioner purchased a 5-percent interest in a Florida land trust that held property in Palm Beach County, Fla., for $32,197. The property was first taken in the name of a partner in petitioner's law firm, as trustee, and shortly thereafter was conveyed by him and the beneficial owners to a bank to hold as trustee of a land trust. The property was taken subject to a nonrecourse mortgage of $2,560,000. It was understood among the investors that either the property would be sold within the year and they would share in the proceeds according to their proportionate interests, or that it would be held for future sale, in which case they would contribute further funds for the mortgage and taxes, again according to their proportionate shares.

According to the terms of the land trust agreement, the beneficiaries held full management and control over the property. During the middle of the following year, the real estate market in Florida collapsed and land values plunged. After consulting with a real estate expert, petitioner decided that the value of his investment was worth substantially less than his share of the outstanding nonrecourse mortgage note. Accordingly, petitioner wrote the bank and the other beneficial owners 1 week before the mortgage payment was due, informing them that he was abandoning his interest in the land trust.

The issue for our decision is whether the loss petitioner sustained on his investment is capital or ordinary. Petitioner

insists that his interest was personal property, and that he effectively abandoned his interest in the land trust in 1974 and because there was no "sale or exchange," he is entitled to an ordinary loss deduction under section 165(a) and section 165(c)(2)[3] which allow a deduction from ordinary income for losses incurred in transactions entered into for profit. Respondent characterizes petitioner's interest as ownership of encumbered real estate and argues that his abandonment of this interest in real estate constituted a sale or exchange of a capital asset under section 165(f), deductible only as a capital loss.[4] While we agree that the interest was one of personalty, respondent nevertheless correctly concluded that the loss sustained by petitioner on his investment was a capital loss.

There is no dispute as to the amount of the loss, or that petitioner's interest in the land trust constituted a capital asset. The parties argue extensively about the character of the interest involved—whether it is an interest in personal property, or an interest in real estate. This side skirmish must be resolved for petitioner, for State statutory and judicial authority expressly provide that an interest in a Florida land trust is an interest solely in personalty. *Ferraro v. Parker*, 229 So. 2d 621 (Fla. Dist. Ct. App. 1969); Fla. Stat. Ann. sec. 689.071 (West 1969). Petitioner, having won this side skirmish, claims victory in the main battle, contending there was an "abandonment" rather than a sale or exchange of his interest in the land trust. We disagree.

Petitioner's interests consisted of a right to share in the

---

[3]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, except where otherwise indicated.

Sec. 165(a) provides:

SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \* \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

\* \* \* \* \* \* \*

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business \* \* \*

[4]Sec. 165(f) provides:

(f) CAPITAL LOSSES.—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.

management and control (including disposition) of the realty, and to receive his share of the income from, or sales proceeds of, the property. Correlative obligations of continued participation included paying a proportionate share of the taxes, mortgage, insurance, and trustees' fees. Additionally, petitioner was required to reimburse and indemnify the trustee for any liability incurred relating to the holding of the property, including "breach of contract, injury to person or property, and fines or penalties under any law." Petitioner's interest was freely alienable by a written assignment which was evidence of ownership of a beneficial interest by the assignee.[5]

This interest was admittedly a capital asset and any gain from its sale would have been taxed as a capital gain. In determining whether a sale and exchange occurred, we are mindful that "Congress intended the words 'sale or exchange' to have a broad meaning, not to be limited to the standard transfer of property by one person to another in exchange for a stated consideration in money or money's worth." *Freeland v. Commissioner*, 74 T.C. 970, 980 (1980). Also, in focusing on the rights petitioner relinquished (to share in the management and control, the income from, and the proceeds of disposition) we note that the courts have tended to reject technicalities and focus on the nature of the rights relinquished; if it was a capital asset, the release of a right is generally characterized as a capital gain. Cf. *Commissioner v. Ferrer*, 304 F.2d 125 (2d Cir. 1962).[6]

With this background, we believe the term "sale or exchange" (as used in section 165(f)) is sufficiently resilient to encompass the circumstances before us. Petitioner abandoned or relinquished his bundle of rights comprising his interest in the land trust. In return for this relinquishment, petitioner was relieved of the obligation to bear a proportionate share of the costs of the

---

[5]For a brief discussion of land trusts, see Note, "Land Trust Act," 18 U. Miami L. Rev. 699 (1964). Trust certificates are commonly issued that "may be pledged or assigned as collateral security in the same manner and facility as certificates of corporate ownership." 18 U. Miami L. Rev., *supra* at 699. Cf. *Ferraro v. Parker*, 229 So. 2d 621 (Fla. Dist. Ct. App. 1969). Whether trust certificates were issued herein does not appear on the record before us. In any event, the formal issuance of a certificate (or the failure to do so) would not alter the bundle of rights and responsibilities constituting petitioner's property interest, and a written assignment appears to operate as the functional equivalent of a certificate.

[6]"The transaction is a capital transaction involving a capital asset and should be, and we think was intended to be, governed by the capital gain and loss provisions." *Freeland v. Commissioner*, 74 T.C. 970, 982 (1980).

mortgage payment, the trustees' fees, the insurance costs, and the taxes payable at the time of his relinquishment. Additionally, to the extent the abandonment was effective, he also was no longer subject to the potential liability resulting from tort or contract litigation associated with the property. We believe this is sufficient to constitute a sale or exchange for purposes of section 165(f), regardless of whether or not a technical abandonment also occurred under State law.

Our views are reinforced by our recent decision in *Freeland v. Commissioner*, 74 T.C. 970 (1980). In *Freeland,* we held that the reconveyance by quitclaim deed of unimproved real estate encumbered by a nonrecourse, purchase-money mortgage by the petitioner/mortgagor to the mortgagee constituted a sale resulting in a capital loss. Although no monetary consideration passed hands and although under California law petitioner's overt act of reconveyance constituted an "abandonment," we held that *"relief* from indebtedness, even though there is no personal liability, is sufficient to support a sale or exchange." 74 T.C. at 981. (Emphasis in original.) In doing so, we stated:

> We do not understand why there should be any difference between a foreclosure sale of the security property or a voluntary reconveyance of the property to the mortgagee. In either event, the mortgagor's interest in the property is terminated and title is transferred to someone else, and the mortgagor receives nothing out of the transaction. In both instances, the mortgagor is relieved of property which has a lien on it and is also relieved of the obligation to pay taxes and assessments against the property. There is no *forgiveness* of indebtedness in either case, although there is a change in the mortgagor's balance sheet or net worth. He no longer has the liability to account for, nor does he have the assets. See dissenting opinion in *Fred H. Lenway & Co. v. Commissioner, supra.* We believe the holdings of *Crane* and subsequent cases decided in the light of *Crane* mandate the conclusion that *relief* from indebtedness, even though there is no personal liability, is sufficient to support a sale or exchange. * * * [*Freeland v. Commissioner, supra* at 981. Emphasis in original.]

Petitioner on brief claims that his interest was "similar to that of a shareholder in a real estate corporation," and that his status was "like a minority shareholder." It may be that the land trust involved would be considered an association for tax purposes (see sec. 7701(a)(3); sec. 301.7701–2, Proced. & Admin. Regs.; *Morrissey v. Commissioner*, 296 U.S. 344 (1935); *Strong v.*

*Commissioner*, 66 T.C. 12 (1976)), and that petitioner would be a shareholder of stock (sec. 7701(a)(7) and (8)).[7] However, this would be of no avail to petitioner, for the loss would then be a capital loss under the provisions of section 165(g)(1).[8]

## *Issue 2. Contributions to Keogh Plan*

The second issue involves the limitations of section 404(e) as applied to contributions made by a law partnership to a Keogh Plan on behalf of petitioner. Normally, the law partnership reported its income on a fiscal year ended March 31. However, in December of 1975, the law partnership was dissolved and thus filed a final tax return for the period April 1, 1975, to December 31, 1975. For each taxable period (the fiscal year ending March 31, 1975, and the final year ending December 31, 1975), the partnership contributed $7,500 to a Keogh Plan on behalf of petitioner which petitioner then deducted on his 1975 tax return. Respondent disallowed $7,500 of the $15,000 deduction representing the 2 separate years of partnership contributions, stating in the deficiency notice that "you are limited to a $7,500 deduction under the provisions of section 404."

Section 404(e)[9] places a limitation on the amounts deductible in any taxable year with respect to contributions made on behalf of any employee of the lesser of $7,500 or 15 percent of the

---

[7]See Note, "The Land Trust Taxable as Association," 8 Tax L. Rev. 103 (1957). Since the parties have not addressed themselves to this issue at any stage of the proceeding, we decline to speculate in any way on how it might be resolved on a proper record.

[8]Sec. 165(g)(1) provides:

SEC. 165. LOSSES.

(g) WORTHLESS SECURITIES.—

(1) GENERAL RULE.—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

[9]Sec. 404(e)(1) provides as follows:

SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOY-EES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DE-FERRED-PAYMENT PLAN.

(e) SPECIAL LIMITATIONS FOR SELF-EMPLOYED INDIVIDUALS.—

(1) IN GENERAL.—In the case of a plan included in subsection (a)(1), (2), or (3), which provides contributions or benefits for employees some or all of whom are employees within the meaning of section 401(c)(1), the amounts deductible under subsection (a) in any taxable year with respect to contributions on behalf of any employee within the meaning of section 401(c)(1) shall, subject to paragraphs (2) and (4), not exceed $7,500, or 15 percent of the earned income derived by such employee from the trade or business with respect to which the plan is established, whichever is the lesser.

earned income of the employee from the trade or business with respect to which the plan was established. The question in our case is to whom or to what entity does the limitation apply— petitioner, individually, or the partnership. If the limitation applies to petitioner, he clearly exceeded it by taking a $15,000 deduction for his 1975 taxable year. If, however, it applies to the partnership, the two $7,500 contributions were made and deducted in 2 separate taxable years of the partnership. Although section 404 could hardly be considered straightforward or easy reading, we think the regulations make clear that the dollar limitation in one taxable year applies to the partnership, and that due to the early termination of the partnership's fiscal year, petitioner properly included the two separate deductions on his 1975 return.

Section 1.404(e)–1A(c), Income Tax Regs., provides as follows:

(c) *Defined contribution plans.* (1) Under section 404(e)(1) in the case of a defined contribution plan, as defined in section 414(i), the amount deductible for the *taxable year of the employer* with respect to contributions on behalf of a self-employed individual shall not exceed the lesser of $7,500 or 15 percent of the earned income derived by such individual for such taxable year from the trade or business with respect to which the plan is established. [Emphasis added.]

For the purposes of section 404(e), the term "employer" refers to the partnership. Sec. 1.404(e)–1A(i)(1), Income Tax Regs.

Section 1.404(e)–1A(f), Income Tax Regs., further provides:

(f) *Partner's distributive share of contributions and deductions.* (1) For purposes of sections 702(a)(8) and 704 in the case of a defined contribution plan, a partner's distributive share of contributions on behalf of self-employed individuals under such a plan is the contribution made on his behalf, and his distributive share of *deductions allowed the partnership under section 404* for contributions on behalf of a self-employed individual is that portion of the deduction which is attributable to contributions made on his behalf under the plan. *The contribution on behalf of a partner and the deduction with respect thereto must be accounted for separately by such partner, for his taxable year with or within which the partnership's taxable year ends, as an item described in section 702(a)(8).*

(2) In the case of a defined benefit plan, a partner's distributive share of contributions on behalf of self-employed individuals and his distributive share of deductions *allowed the partnership under section 404* for such contributions is determined in the same manner as his distributive share of partnership taxable income. See section 704, relating to the determination of the distributive share and the regulations thereunder.

[Emphasis added.]

Thus, the regulations specifically refer to the taxable year of the *employer* when explaining the dollar limitations and to the deductions allowed the *partnership* under section 404.[10] Therefore, we hold that the dollar limitations on deductions taken within one taxable year contained in section 404(e) are in reference to the taxable year of the partnership, and were not violated in the instant case. In addition, due to the dissolution of the partnership on December 31, 1975, petitioner properly accounted for the deductions for the final short year on his 1975 tax return because 1975 was the taxable year with or within which the partnership taxable year ended. See sec. 1.404(e)–1A(f), Income Tax Regs.

On brief, respondent chose to abandon his argument that the dollar limitations of section 404(e) apply to the taxable year of the petitioner, individually, and offered a new theory as to why $7,500 of the $15,000 deduction should not be allowed. Although the record shows that petitioner's share of ordinary income from the partnership for the period from April 1, 1974, through March 31, 1975, was $141,872, respondent argues on brief for the first time that petitioner did not meet his burden in showing that the $7,500 contribution made by the partnership for that period was not in excess of 15 percent of petitioner's *earned* income, or compensation for personal services actually rendered. See sec. 401(c)(2).

We shall not consider such a belated argument. The notice of deficiency as well as respondent's pretrial memorandum make clear that the grounds for the disallowance of $7,500 of the deduction was the dollar limitation of section 404(e) as applied to petitioner's taxable year—not whether petitioner *earned* sufficient income from personal services actually rendered so as to enable the law firm to make a contribution of $7,500 on his behalf. Being unaware of respondent's new theory, petitioner did not present evidence at trial to show that at least $50,000 of the $141,872 of partnership income reported by him for the period ending March 31, 1975, constituted "earned income" within the meaning of section 401(c)(2).

Because respondent first raised this argument on brief, it

---

[10]We note that respondent is on record as stating that the term "taxable year" under sec. 404(e) refers to the taxable year of the employer, the partnership, rather than the taxable year of each partner. Rev. Rul. 68–138, 1968–1 C.B. 183.

would be unfair and prejudicial to petitioner to consider it now, and we refuse to do so. *Riss v. Commissioner*, 56 T.C. 388, 401 (1971), supplemental opinion 57 T.C. 469 (1971), affd. 478 F.2d 1160 (8th Cir. 1973); *Theatre Concessions, Inc. v. Commissioner*, 29 T.C. 754, 760–761 (1958). Therefore, petitioner is entitled to deduct $15,000 for contributions made on his behalf to a Keogh Plan by the law partnership during 2 separate taxable years of the partnership.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year at issue, unless otherwise indicated.