T.C. Memo. 1997-469


UNITED STATES TAX COURT


L&C SPRINGS ASSOCIATES, SOLOMON A. WEISGAL INVESTMENT ASSOCIATES,
TAX MATTERS PARTNER, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 11361-92, 10933-93,     Filed October 15, 1997.
11969-94.


<u>Randall G. Dick</u> and <u>Jeffrey I. Margolis</u>, for petitioners.

<u>John J. Comeau</u> and <u>Rogelio A. Villageliu</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  By notices of final partnership

administrative adjustments (FPAA), respondent determined

―――――――――――――
[1]     Cases of the following petitioners are consolidated
herewith:  L&C Springs Associates, Solomon A. Weisgal Investment
Associates, Tax Matters Partner, docket No. 10933-93; and L&C
Springs Associates, Century Capital Corp., Tax Matters Partner,
docket No. 11969-94.

adjustments to L&C Springs Associates' (L&C Springs') 1988, 1989, and 1990 Federal partnership income tax returns, as follows:

| | Respondent's Partnership Adjustments | | |
| Year | Income On Discharge Of Indebtedness | Interest Expense | Depreciation Expense |
| --- | --- | --- | --- |
| 1988 | $2,250,000 | $(254,413) | $(168,350) |
| 1989 | 2,250,000 | (264,858) | (167,707) |
| 1990 | 2,250,000 | (261,961) | (167,722) |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The above $2,250,000 in income that respondent charged to L&C Springs in respondent's FPAA for each of the years 1988, 1989, and 1990 is the same item of income and relates to respondent's contention that L&C Springs' ownership interest in two apartment complexes (the L&C Properties) through a Florida land trust was effectively abandoned or terminated in either 1988, 1989, or 1990, triggering, for Federal income tax purposes, a sale or exchange of L&C Springs' interest in the L&C Properties.

Respondent's primary position is that L&C Springs' ownership interest in the L&C Properties should be treated as having been terminated as of the end of October of 1990. Alternatively and only as a protective measure, respondent contends that L&C

Springs' interest in the L&C Properties should be treated as having been terminated in 1988 or 1989.

The only issue for decision is whether L&C Springs' ownership interest in the L&C Properties was abandoned or terminated triggering for Federal income tax purposes a sale or exchange of L&C Springs' interest therein in 1988, 1989, or 1990. If we conclude that L&C Springs' ownership interest in the L&C Properties was abandoned or terminated in one of those years, then L&C Springs would be required, under sections 1001, 1231, 1245, and 1250, to recognize ordinary income and capital gain in the year of such abandonment or termination based on the amount of accelerated depreciation claimed on the L&C Properties and on the amount realized on such sale or exchange. Also, the above interest and depreciation deductions that were claimed for 1988, 1989, and 1990 with respect to L&C Springs' ownership interest in the L&C Properties would not be allowable for any period of time after such abandonment or termination occurred.

FINDINGS OF FACT

On May 5 and June 30, 1980, Tanglewood Properties, Inc. (Tanglewood), purchased from the Clinton Family Trust for a total stated consideration of $2.1 million, subject to three existing mortgages securing the land and buildings, an ownership interest in a Florida land trust that owned the L&C Properties and the related land. The L&C Properties were located in Miami and in

Miami Springs, Florida, just north of Miami International Airport.

From 1980 through 1983, Burton Kanter (Kanter), and from 1983 through 1991, Lawrence A. Freeman, served as president of Tanglewood. From 1983 through 1991, Lloyd J. Boggio (Boggio) served as vice president of Tanglewood.

Tanglewood's $2.1 million stated purchase price for the L&C Properties was reflected by cash, by short-term notes guaranteed by Kanter, and by a $1.6 million wrap-around mortgage note that Tanglewood issued in favor of the Clinton Family Trust.

The record does not reflect the history of the ownership of the L&C Properties by the Clinton Family Trust, specifically when and for what consideration the Clinton Family Trust acquired the L&C Properties.

On October 29, 1981, L&C Springs was formed under the laws of the State of Illinois as a tax-oriented limited partnership for the purpose of purchasing from Tanglewood an interest in the L&C Properties.

At the time the petitions were filed, L&C Springs' principal place of business was located in Chicago, Illinois.

L&C Springs' two original general partners were Solomon A. Weisgal Investment Associates (SAWIA)[2] and Century Capital Corp. (Century Capital).[3]

L&C Springs' limited partners included, among others, First Rate Investments, a partnership composed of members of Kanter's family and trusts established for the benefit of members of Kanter's family.

As of 1981 and throughout the years in issue, Tanglewood was a wholly owned subsidiary of The Holding Co., a Delaware corporation, with its principal place of business in Chicago, Illinois.[4] The same few individuals (namely, Kanter, Solomon A. Weisgal (Weisgal), and Boggio) who controlled Tanglewood and The Holding Co. also controlled L&C Springs and the activities of L&C Springs. The transactions entered into between Tanglewood and

---

[2] As of 1981, SAWIA's general partner was the Solomon A. Weisgal Revocable Trust, Solomon A. Weisgal, co-trustee, and the limited partners were all members of or entities for the benefit of Solomon A. Weisgal's immediate family.

[3] Century Capital Corp. was a Delaware corporation, the beneficial owners of which were entities for the benefit of Solomon A. Weisgal's immediate family and a trust for the benefit of Sharon Meyers, president of First Rate Investments (a limited partner of L&C Springs).

[4] From 1977 through 1982 and from 1990 through 1991, Burton W. Kanter served as president of The Holding Co. From 1977 through 1982, Solomon Weisgal served as vice president of The Holding Co., and from 1982 through 1986, he served as president of The Holding Co. From 1987 through 1989, Joshua Kanter, son of Burton W. Kanter, served as president of The Holding Co. The shareholders of The Holding Co. constituted, in large part, trusts for the benefit of Burton W. Kanter, Solomon Weisgal, and their family members.

L&C Springs and the management companies relating to the L&C Properties were not conducted in an arm's-length manner.

In order to finance L&C Springs' purchase of the L&C Properties, SAWIA and Century Capital, as L&C Springs' general partners, promoted investment in L&C Springs through private placement memoranda distributed primarily to friends and family of Kanter and Weisgal. These memoranda described generally the significant economic risks associated with investments in L&C Springs and explained the significant tax benefits that the investors, as limited partners, were expected to claim on their individual income tax returns.

L&C Springs' private placement memorandum specifically indicated that the projected rental revenue from the L&C Properties would not be sufficient to cover expenses and to pay off L&C Springs' debt obligations and that the only way an investment in L&C Springs would be profitable would be if the apartments were converted into condominium units and sold or if the L&C Properties were sold for a substantial gain.

Under L&C Springs' partnership agreement, during each of the years 1981 through 1986, each limited partner was obligated to make additional annual capital contributions to L&C Springs in amounts based on each limited partner's ownership interest. The total amount of the additional capital contributions that L&C Springs was to receive from its limited partners equaled $1,035,000.

At the time investments in L&C Springs were being promoted, the apartment units in the L&C Properties maintained a high occupancy rate due to employees of Eastern, National, and Pan American Airlines who were based at the Miami International Airport.

On October 30, 1981, L&C Springs entered into an agreement with Tanglewood to purchase for a stated consideration of $2.8 million Tanglewood's ownership interest in the Florida land trust that held title to the L&C Properties and that held title to the underlying land.  L&C Springs' stated $2.8 million purchase price for the L&C Properties was reflected solely by a seller-financed, nonrecourse $2.8 million promissory wrap-around note from L&C Springs (the L&C Note) in favor of Tanglewood.

At the time of the above transaction, Tanglewood's $1.6 million mortgage note and the three existing mortgages relating to its 1980 purchase of the L&C Properties were not paid off. Those mortgages remained outstanding and were wrapped by the $2.8 million L&C Note.  In other words, L&C Springs' payments to Tanglewood on the $2.8 million L&C Note were intended to be used by Tanglewood to make payments due on Tanglewood's $1.6 million mortgage note.

Effective simultaneously with the above transaction, L&C Springs exercised an option set forth in the L&C purchase agreement to reduce the stated purchase price for, and to alter significantly the nature of, its ownership interest in the

Florida land trust and in the L&C Properties.  Under that option, the stated purchase price for L&C Springs' interest in the L&C Properties was reduced from $2.8 million to $2,450,000 (reflected by a nonrecourse promissory note), and L&C Springs immediately reconveyed to Tanglewood ownership of the underlying land and effectively ownership of the apartments and other improvements associated with the L&C Properties.  L&C Springs, through the Florida land trust, retained only nominal title to the L&C Properties and a 15-year leasehold interest in the land, in the apartments, and in other improvements on the land.  For the 15-year lease of the underlying land, L&C Springs agreed to make separate, fixed lease payments of $36,000 each year.

In effect, for the reduced stated purchase price of $2,450,000, L&C Springs retained, through the Florida land trust, only a 15-year leasehold interest in the L&C Properties.

Under the lease agreement that L&C Springs and Tanglewood entered into, during the last year of the 15-year lease of the land (namely, from January 1, 1995 through July 1, 1996), L&C Springs, through the Florida land trust, had an option to purchase from Tanglewood the L&C Properties and the related land.

L&C Springs' $2,450,000 debt obligation agreed to in connection with the reduced purchase price for L&C Springs' 15-year leasehold interest in the L&C Properties was due to be paid to Tanglewood with four annual principal payments to Tanglewood of $50,000 each, due on July 1 of 1982, 1983, 1984, and 1985, and

with a balloon payment due on January 31, 1987, of $2,250,000, plus accrued interest.

Under a collateral agreement of December 15, 1981, that was entered into between Tanglewood and L&C Springs, upon default on L&C Springs' $2,450,000 debt obligation, Tanglewood had the right to terminate L&C Springs' leasehold interest in the L&C Properties, and upon any foreclosure of its leasehold interest, L&C Springs waived any right under Illinois State law of redemption of its leasehold interest in the L&C Properties.

L&C Springs hired Clinton, Boggio & Associates (CB&A) to manage the L&C Properties. Boggio was president of CB&A and he personally managed the L&C Properties and, with Weisgal and Kanter, participated in all significant business decisions regarding the L&C Properties.

The relationship between "Clinton" of CB&A and the Clinton Family Trust (which owned the L&C Properties prior to the sale to Tanglewood) is not explained in the record.

Generally, rental income collected from the L&C Properties was used to cover CB&A's management service fees, operating expense of the L&C Properties, real estate taxes, and liability insurance coverage.

In November of 1983, Tanglewood refinanced with California Federal Savings & Loan (Cal Fed) for $1.8 million the underlying senior three mortgages outstanding and secured by the L&C Properties. As a result of this refinancing, $300,000 in excess

cash should have been made available to Tanglewood to use in connection with the management and the expenses relating to the L&C Properties. This $300,000, however, was not so used. It was transferred to a management company controlled by Kanter.

In 1985, Tanglewood again refinanced with Cal Fed for $1,952,500 the underlying senior $1.8 million mortgages outstanding and secured by the L&C Properties. As part of this refinancing, Tanglewood represented to Cal Fed that Tanglewood alone was the owner of the L&C Properties. No mention was made of an interest of L&C Springs in the L&C Properties. The funds from this second refinancing were used to retire the mortgage with Cal Fed.

As a result of this refinancing, it appears that $140,000 in excess cash should have been made available to Tanglewood to use in connection with the management and the expenses relating to the L&C Properties. This $140,000, however, was not so used. It was sent directly to Kanter.

By January 31, 1987, L&C Springs had made each of the four annual $50,000 payments due Tanglewood on L&C Springs' $2,450,000 debt obligation, representing total payments of $200,000.

On January 31, 1987, however, L&C Springs did not make the $2,250,000 balloon payment of principal on the L&C Note that L&C Springs owed to Tanglewood. After this default on January 31, 1987, L&C Springs made no further payments on the L&C Note to

Tanglewood, and L&C Springs made no further payments of real estate taxes due on the L&C Properties.

Neither in 1987 nor at any time thereafter did Tanglewood take any foreclosure action against L&C Springs' leasehold interest in the L&C Properties, nor did Tanglewood take any other formal action to recover the $2,250,000 stated balance due on the L&C Note.

After January 31, 1987, on its books and records, L&C Springs continued to accrue unpaid interest on the $2,250,000 principal balance due on the L&C Note, and rental income received from the L&C Properties, after operating expenses, was turned over to Tanglewood and Cal Fed and was used to pay down Tanglewood's senior debt obligation to Cal Fed. No portion of such net rental income paid to Cal Fed appears to have been applied to reduce the principal amount of the balance owed on the L&C Note.

From approximately 1985 forward, rental activities relating to the L&C Properties operated at an annual cash deficit of at least $63,000.

During 1988, 1989, and 1990, Eastern, National, and Pan American Airlines each encountered financial difficulties. By 1990, layoffs of airline employees had occurred, and the occupancy rate of the L&C Properties declined.

In 1988, Tanglewood defaulted on its mortgage loan payments owed to Cal Fed, and Cal Fed commenced foreclosure proceedings.

A loan was obtained by Kanter in the amount of $108,141 and the funds therefrom were loaned to Tanglewood to cure Tanglewood's mortgage loan default and to pay other expenses. As a result, Cal Fed's foreclosure proceedings against Tanglewood were withdrawn.

In 1989, L&C Springs ceased paying to Tanglewood the rent owed for the lease of the land associated with the L&C Properties. By December of 1990, L&C Springs had unpaid but accrued rent of $51,000 owed to Tanglewood relating to the land.

On July 1, 1989, Tanglewood again defaulted on its mortgage debt obligation to Cal Fed. Tanglewood unsuccessfully made some efforts to again refinance its debt obligation with Cal Fed. L&C Springs obtained no additional funds from L&C Springs' limited partners and from outside lenders, and Tanglewood's default was not cured.

In 1989, SAWIA sold for $1 to Century Capital its general partnership interest in L&C Springs.

In November of 1989, Cal Fed again commenced foreclosure proceedings against Tanglewood with regard to the L&C Properties. In the foreclosure proceedings, Tanglewood represented that it alone owned the L&C Properties, and no disclosure was made either of the Florida land trust's or of L&C Springs' leasehold interest therein.

On April 26, 1990, and May 1, 1990, in the above foreclosure proceedings, Cal Fed obtained final judgments of foreclosure on

the L&C Properties. All rental income from the L&C Properties was ordered to be turned over directly to Cal Fed and court-ordered sales of the L&C Properties were scheduled for May 24 and May 29, 1990.

On May 16, 1990, pursuant to decisions made by Boggio, Kanter, and Weisgal, Tanglewood filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the Southern District of Florida for the purpose of triggering an automatic stay of the scheduled foreclosure sales of the L&C Properties. By filing for bankruptcy, the individuals controlling Tanglewood and L&C Springs hoped to delay for as long as possible the realization of ordinary income and capital gain by L&C Springs and its limited partners that would be triggered upon a foreclosure sale of the L&C Properties.

In disclosure statements prepared by Boggio and provided by Tanglewood to the Bankruptcy Court in connection with Tanglewood's bankruptcy proceedings, Tanglewood represented itself as the owner of the L&C Properties.

In these bankruptcy proceedings, general reference was made to a Florida land trust, but in financial statements filed on behalf of Tanglewood, the $2,250,000 stated debt obligation of L&C Springs to Tanglewood with regard to the L&C Properties was not listed as an asset of Tanglewood, nor reflected in any other way.

On October 29, 1990, Cal Fed and Tanglewood executed an agreement (October 1990 Agreement) in which Tanglewood agreed to dismissal of its bankruptcy proceedings in exchange for Cal Fed's agreement to reschedule the foreclosure sale of the L&C Properties until after February 15, 1991. Under the October 1990 Agreement between Cal Fed and Tanglewood, management and control of the L&C Properties were turned over to Cal Fed, including all security deposits, receivables, contracts, and books and records relating to the L&C Properties and rental income received. Tanglewood's bankruptcy was dismissed on November 1, 1990.

By November 1, 1990, Cal Fed had obtained control over the L&C Properties and possessed all of the burdens and benefits of ownership of the L&C Properties.

As indicated, in spite of L&C Springs' 1987 default on the L&C Note, Tanglewood never initiated proceedings to terminate L&C Springs' leasehold interest in the L&C Properties.

The October 1990 Agreement effectively conveyed to Cal Fed L&C Springs' remaining 6-year leasehold interest in the L&C Properties (as of 1990, the remaining term on L&C Springs' 15-year leasehold was 6 years), terminated L&C Springs' underlying ground lease relating to the L&C Properties, and relieved L&C Springs of its obligation to Tanglewood on the L&C Note. Under the October 1990 Agreement, it was represented that no right of redemption would be exercised to interfere with foreclosure of the L&C Properties.

As of November 1, 1990, the fair market value of the L&C Properties and the related land was no more than $1,750,000.

In February and June of 1991, foreclosure sales of the L&C Properties occurred with Cal Fed the highest bidder and ultimate purchaser.

From 1981 through 1991, employees of SAWIA maintained the books and records relating to income and expenses of L&C Springs and the L&C Properties, and SAWIA and other accountants prepared and filed L&C Springs' Federal partnership income tax returns.

For 1981 through 1986, years not in issue, Weisgal and other accountants filed Federal partnership income tax returns on behalf of L&C Springs, reflecting substantial net operating losses of L&C Springs, accrued interest expenses on the L&C Note to Tanglewood, and accelerated depreciation expenses relating to the L&C Properties. These substantial claimed tax benefits were passed through to L&C Springs' limited partners.

For 1987, 1988, 1989, and 1990, Weisgal or other accountants also prepared and filed on behalf of L&C Springs, Federal partnership income tax returns reflecting, among other items, accrued interest on the L&C Note and depreciation expenses relating to the L&C Properties. These claimed interest and depreciation expenses for just 1988, 1989, and 1990, totaled approximately $1,285,011. On none of L&C Springs' partnership income tax returns for those years was income or gain reported relating to cancellation of the L&C Note or a termination or

abandonment of L&C Springs' ownership interest in the L&C Properties.

On L&C Springs' books and records for 1990 and 1991 and on L&C Springs' 1990 and 1991 Federal partnership income tax returns, rental income relating to the L&C Properties was reported only up until November 1, 1990.  After November 1, 1990, only Cal Fed received and reported rental income from the L&C Properties.

On November 15, 1991, final closing entries were made in L&C Springs' books and records, and the L&C Springs partnership was apparently dissolved as of that date.

From the date of the initial investment by L&C Springs in the L&C Properties, the investors in L&C Springs received tax advice from Kanter that upon any sale, foreclosure, or abandonment of L&C Springs' interest in the L&C Properties income would be realized by L&C Springs in connection with the discharge of L&C Springs' $2,250,000 debt obligation to Tanglewood.

For L&C Springs' short taxable year January 1 to November 15, 1991, a Federal partnership income tax return on behalf of L&C Springs was filed on which was reported a taxable gain under sections 1001, 1231, 1245, and 1250 relating to the termination of L&C Springs' leasehold interest in the L&C Properties.  Based on that gain, total distributive income to the general and limited partners of L&C Springs was reported on L&C

Springs' 1991 Federal partnership income tax return of $2,321,014.

On L&C Springs' 1991 Federal partnership income tax return, it was indicated that, because "the apartment buildings in Miami Springs, Florida, are in bankruptcy" the records necessary to report L&C Springs' net operating losses and other expenses could not be located, and therefore no net operating losses or depreciation expenses were reported and deducted relating to the L&C Properties. It does not appear from the record that L&C Springs ever filed an amended 1991 Federal partnership income tax return claiming any 1991 net operating losses, accrued interest, or depreciation expenses relating to the L&C Properties.

The following schedule reflects net losses and related interest and depreciation expenses relating to the L&C Properties as claimed by L&C Springs for 1987 through 1990.

|  |  | As Claimed By L&C Springs | |
| Year | Income (Loss) | Interest Expense | Depreciation Expense |
| --- | --- | --- | --- |
| 1987 | $(278,646) | $(250,075) | $(164,855) |
| 1988 | (328,373) | (254,413) | (168,350) |
| 1989 | (350,570) | (264,858) | (167,707) |
| 1990 | (301,033) | (261,961) | (167,722) |

On audit for 1987, not now before the Court, respondent, on April 5, 1991, issued an FPAA to L&C Springs charging L&C Springs with $2,250,000 in ordinary income on the ground that L&C Springs effectively abandoned to Tanglewood its ownership interest in the

L&C Properties and that L&C Springs realized discharge of indebtedness income relating thereto. Respondent also disallowed L&C Springs' accrued interest expense and depreciation expense deductions that were claimed on L&C Springs' 1987 Federal partnership income tax return.

At docket No. 13915-91, L&C Springs filed a petition with this Court contesting the above partnership adjustments made by respondent with respect to L&C Springs for 1987. After negotiations between the parties, respondent conceded each of the above adjustments for 1987. On February 18, 1993, a decision was entered by this Court in docket No. 13915-91 reflecting the above settlement of the parties and ordering that the partnership items of L&C Springs be accepted as claimed on L&C Springs' Federal partnership income tax return for 1987.

As explained, for 1988, 1989, and 1990, respondent issued protective FPAA's charging L&C Springs with the same $2,250,000 in income on the ground that, in either 1988, 1989, or 1990 L&C Springs effectively abandoned or transferred to Tanglewood its ownership interest in the L&C Properties and that such abandonment or transfer triggered a realization of the full $2,250,000 principal amount of the L&C Springs' debt obligation to Tanglewood. On brief, respondent concedes that the $2,250,000 should be reduced by L&C Springs' adjusted tax basis of its ownership interest in the L&C Properties. Respondent also disallowed L&C Springs' accrued interest expense and depreciation

expense deductions that were claimed on its 1988, 1989, and 1990 Federal partnership income tax returns.

## OPINION

Under the authority of Commissioner v. Tufts, 461 U.S. 300 (1983), the parties do not dispute that, in the year in which L&C Springs' ownership interest in the L&C Properties was terminated and L&C Springs was thereby relieved of its debt obligation to Tanglewood, the amount of L&C Springs' $2,250,000 nonrecourse debt obligation relating to the L&C Properties is to be treated, under sections 1001, 1221(2), 1231, 1245, and 1250, as part of the amount of income realized by L&C Springs (to be reduced by L&C Springs' adjusted tax basis in its leasehold interest in the L&C Properties). See Estate of Delman v. Commissioner, 73 T.C. 15, 32-33 (1979).

Also as indicated, the parties agree that for periods of time after L&C Springs' ownership interest in the L&C Properties was terminated all interest and depreciation deductions claimed by L&C Springs should be disallowed.

A formal sale or exchange of property constitutes an identifiable event that will trigger realization of gain or loss relating to a taxpayers' ownership interest in property. Secs. 165(f), 1001. Other events, however, may also constitute an identifiable event that will trigger realization of gain or loss relating to ownership of property. An involuntary foreclosure

sale of real property, a tax forfeiture of real property, a conveyance of real property to a mortgagee by quitclaim deed in lieu of foreclosure, a decline in the value of real property below the amount of nonrecourse debt associated with the property combined with a conveyance of the property by quitclaim deed to the mortgagee, an abandonment of property subject to nonrecourse debt, relief from indebtedness associated with property, and extinguishment of a taxpayer's right of redemption following a foreclosure sale of property may all be treated as a sale or exchange triggering realization of gain or loss relating to property. Commissioner v. Tufts, supra at 308-309; Helvering v. Nebraska Bridge Supply & Lumber Co., 312 U.S. 666 (1941); Helvering v. Hammel, 311 U.S. 504, 511 (1941); Yarbro v. Commissioner, 737 F.2d 479, 485-486 (5th Cir. 1984), affg. T.C. Memo. 1982-675; Laport v. Commissioner, 671 F.2d 1028, 1033-1034 (7th Cir. 1982), affg. T.C. Memo. 1980-355; R. O'Dell & Sons Co. v. Commissioner, 169 F.2d 247, 248 (3d Cir. 1948), affg. 8 T.C. 1165 (1947); Lockwood v. Commissioner, 94 T.C. 252, 260 (1990); Allan v. Commissioner, 86 T.C. 655, 659-660 (1986), affd. 856 F.2d 1169 (8th Cir. 1988); Middleton v. Commissioner, 77 T.C. 310, 320-321 (1981), affd. per curiam 693 F.2d 124 (11th Cir. 1982); Freeland v. Commissioner, 74 T.C. 970, 981-983 (1980); Belcher v. Commissioner, T.C. Memo. 1965-1; sec. 1.1001-2(a), Income Tax Regs.

Also, it has been specifically held that abandonment of a beneficial interest in a Florida land trust subject to a nonrecourse debt may constitute a sale or exchange and may trigger realization of gain or loss associated with an interest in the land trust. Arkin v. Commissioner, 76 T.C. 1048, 1055-1056 (1981). In Arkin, in 1974, the year following the taxpayer's acquisition of an ownership interest in a Florida land trust, the value of the underlying property associated with the land trust declined dramatically. The taxpayer notified one of the banks holding a mortgage loan on the underlying property and each of the beneficiaries of the land trust of his intention to abandon his interest in the land trust. In subsequent years, creditors holding superior mortgages on the underlying property foreclosed on the property and sold it at a foreclosure sale. We held that the taxpayer's actions regarding his interest in the land trust constituted an abandonment in 1974 of his interest in the land trust, that such abandonment constituted a sale or exchange, and that the loss realized constituted a capital loss under section 165(f), not an ordinary loss deduction under section 165(a) and (c)(2). Id. at 1053-1056.

Based on the evidence before us, we conclude that L&C Springs' ownership interest in the L&C Properties was, for Federal income tax purposes, effectively terminated as of November 1, 1990. Certainly, by November 1, 1990, L&C Springs, and all individuals associated with L&C Springs and Tanglewood

and the other entities involved in this transaction had for all intents and purposes (apart from L&C Springs' reporting of the income in question for 1991) treated L&C Springs as having no continuing substantive ownership interest in the L&C Properties. Effectively, as of November 1, 1990, L&C Springs' ownership interest in the L&C Properties was not regarded as viable by the parties, had no value, and was effectively extinguished.

The October 1990 Agreement between Tanglewood and Cal Fed transferred all attributes of ownership (except nominal title) of the L&C Properties from Tanglewood to Cal Fed. It effectively relieved L&C Springs of its $2,250,000 debt obligation to Tanglewood and disposed of L&C Springs' leasehold interest in the L&C Properties.

Neither in 1987, 1988, 1989, 1990, nor in any later year, did Tanglewood seek to collect the defaulted $2,250,000 debt obligation due from L&C Springs. Tanglewood's financial disclosures in its bankruptcy proceeding in 1990 did not disclose L&C Springs' stated debt obligation to Tanglewood as an asset of Tanglewood.

The credible evidence indicates that L&C Springs' tax return treatment of the termination of its ownership interest in the L&C Properties as not having occurred until 1991 constituted simply an attempt, by the various individuals associated with L&C Springs and Tanglewood, to defer, for income tax purposes,

realization of L&C Springs' income relating to relief on its $2,250,000 nonrecourse indebtedness to Tanglewood.

Petitioners contend that Tanglewood's and Cal Fed's postponement until 1991 of the foreclosure sale was based on the hope that additional funds might be raised by L&C Springs to avoid the foreclosure sale. This contention is not credible. L&C Springs defaulted on its indebtedness to Tanglewood as early as 1987. It was apparent in October of 1990, and earlier, that no additional funds would be available and that a foreclosure sale was inevitable.

In 1989, L&C Springs ceased paying Tanglewood rent due on the land relating to the L&C Properties. As of the end of October of 1990, CB&A had turned over all management of the properties to Cal Fed and to a management company working for Cal Fed. By December of 1990, L&C Springs no longer reported rental income from the L&C Properties.

Petitioners rely on cases involving recourse debt and argue that no sale or exchange occurs until a foreclosure sale occurs and until a taxpayer's right of redemption of the foreclosed property expires. See R. O'Dell & Sons Co. v. Commissioner, supra; Eisenberg v. Commissioner, 78 T.C. 336 (1982). Where, however, recourse debt is involved (as distinguished from nonrecourse debt that is involved in the instant cases) abandonment or other disposition of the underlying property will not trigger a sale or exchange because the debt is not

necessarily extinguished. The possibility of a deficiency judgment against the debtor exists based on the recourse nature of the debt obligation, and the amount of the gain or loss cannot be fixed until the foreclosure sale takes place. Commissioner v. Green, 126 F.2d 70, 71-72 (3d Cir. 1942); Aizawa v. Commissioner, 99 T.C. 197, 200-202 (1992), affd. without published opinion 29 F.3d 630 (9th Cir. 1994); Lockwood v. Commissioner, 94 T.C. 252, 260 (1990).

Petitioners do not sufficiently appreciate the nonrecourse nature of L&C Springs' $2,250,000 debt obligation and the many facts in these cases indicating that, certainly by November of 1990, all of the individuals and entities associated with this transaction treated L&C Springs, for all purposes other than tax, as having no continuing viable ownership interest in the L&C Properties.

Petitioners fail to take into account that, under the collateral agreement, L&C Springs expressly waived any right of redemption. Further, petitioners have not cited any Florida law that would provide that a mere holder of a leasehold interest in buildings and improvements would have a right of redemption following a foreclosure sale of the underlying land.

In summary, although the October 1990 Agreement was between Tanglewood and Cal Fed, the individuals in control of Tanglewood were also in control of L&C Springs. Under the October 1990 Agreement, Cal Fed was given control and management of the L&C

Properties and the underlying land, and Cal Fed received the benefits of ownership.  As of November 1, 1990, no additional funding was available, and the individuals involved with Tanglewood and L&C Springs knew that no further funds would become available and agreed that a foreclosure sale would occur and that no right of redemption was available.  Only formal, nominal title to the property was withheld from Cal Fed until 1991.  By November 1, 1990, L&C Springs had effectively abandoned its leasehold interest in the L&C Properties and the related land, and L&C Springs was relieved by such abandonment of its nonrecourse debt obligation to Tanglewood.

Based on the above analysis, L&C Springs is required to realize, as of November 1, 1990, income associated with the termination of its interest in the L&C Properties and with the relief from its $2,250,000 debt obligation to Tanglewood on the L&C Note.  Also, any interest expense deductions and depreciation deductions claimed by L&C Springs for periods of time after October 31, 1990, are to be disallowed.[5]

Decisions will be entered

under Rule 155.

---

[5]    Petitioners' counsel represent that L&C Springs should have a limited right under mitigation to open up L&C Springs' 1991 taxable year to remove the gain reported for 1991 relating to the transaction that we treat herein as taxable in 1990.  Our opinion herein, however, is not dependent upon correction of petitioners' treatment of this item for 1991.